Alfred J. WELSH, as Guardian for Kevin Singer, A Minor and Cabinet for Health Services, Commonwealth of Kentucky, Appellant,

v.

GALEN OF VIRGINIA, INC. d/b/a University of Louisville Hospital University Gynecological & Obstetrical Foundation, Inc.; C.S.B. Tucker, M.D.; Maureena Turnquest, M.D.; David R. Potts, M.D.; Resad Pasic, M.D.; and Stanley Gall, M.D., Appellees.

No. 1999–CA–000865–MR.

Court of Appeals of Kentucky.

May 11, 2001.

As Modified on Grant of Rehearing Aug. 17, 2001.

Discretionary Review Denied by Supreme Court March 10, 2004.

Mikell Grafton–Skinner, Louisville, Jack Beam Littleton, CO., for Appellant.

Michael K. Kirk, Louisville, for Appellee, University Gynecological & Obstetrical Foundation, Inc.

Beverley Glascock, Frank P. Doheny, Jr., Louisville, for Appellee, Galen of Virginia, Inc.

Paul J. Bishop, William P. Swain, William O. Guethlein, Louisville, for Appellee, C.S.B. Tucker.

W. Kennedy Simpson, Louisville, for Appellees, Dr. Turnquest, Dr. Potts, Dr. Pasic and Dr. Gall.

Before BUCKINGHAM, GUIDUGLI and HUDDLESTON, Judges.

## OPINION

GUIDUGLI, Judge.

Alfred J. Welsh, Guardian for Kevin Singer, a minor, and Cabinet for Health Services, Commonwealth of Kentucky (collectively Welsh) appeal from a judgment of the Jefferson Circuit Court entered March 5, 1999, granting a directed verdict in favor of C.S.B. Tucker, M.D. (Dr. Tucker), and from a judgment entered in favor of Galen of Virginia, Inc. d/b/a University of Louisville Hospital (the Hospital), University Gynecological and Obstetrical Foundation, Inc. (the Foundation), Maureena Turnquest, M.D. (Dr. Turnquest), David R. Potts, M.D. (Dr. Potts), Resad Pasic, M.D. (Dr. Pasic), and Stanley Gall, M.D. (Dr. Gall) on March 15, 1999, following a jury trial. We affirm both judgments.

## FACTS

The Foundation operates a nonprofit gynecological/obstetrical clinic across the street from the Hospital. The clinic is the primary obstetric/gynecologic care provider for indigent female patients in Louisville. At all times relevant hereto, Dr. Gall was the president of the clinic and Dr. Potts was the clinic's medical director. Drs. Gall, Potts, and Pasic served as attending physicians in the clinic on a rotating basis. Dr. Turnquest was a fellowship resident at the Hospital. Dr. Tucker was an intern completing a rotation in the clinic.

Tambra Dunn (Dunn), Kevin's mother, came under the clinic's care in March 1992 when she discovered she was pregnant. During her first visit to the clinic Dunn received an appointment card which stated in pertinent part:

> If you are having a problem . . . you may call the clinic at 588–7636. The phone will be answered by our receptionist and if necessary she will let you talk with a nurse. . . . If you need to call after hours or on Weekends [sic], call Humana Hospital University (Labor and Delivery) at 562–3094.

> You should call the clinic or come to the hospital if you experience any of the following:

> 1) baby stops moving

> 2) vaginal bleeding (like a normal period)

> 3) regular contractions

> 4) water breaks (ruptured membranes)

Dunn testified at trial that she read and understood the instructions printed on the appointment card.

Dunn's pregnancy progressed normally until August 30, 1992. On that date Dunn went to the Hospital with complaints of leaking fluid. Upon discharge after exami-

nation, Dunn was given a set of discharge instructions which advised her to call the Hospital if "you don't feel the baby move four times an hour." Dunn testified that she read the discharge instructions and kept them in her purse. She also testified that she understood she was to call the hospital if she noted a decrease in fetal movement.

Dunn returned to the clinic for a regularly scheduled appointment on September 30, 1992. When she reported to the clinic staff that she had experienced reduced fetal movement over the past two days, a biophysical profile was performed. The test results showed no problems with the fetus. Dunn was given a fetal movement card (FMC) and told to count the baby's movements twice daily. The FMC stated:

(1) If fetal movements are 4 or more per hour return to the office as scheduled. Please bring this card.

(2) If fetal movements are less than 4 per hour, count for another hour. If movement remains less than 4 per hour immediately call the office at 588–7636 or labor and delivery after 4:30 p.m. and weekends at 562–3094.

Dunn returned completed FMCs to the clinic on her visit of October 7 and October 21, 1992. Dunn testified that she used the FMCs as instructed and that the number of fetal movements she recorded were within acceptable limits. Although she was given no more FMCs following the October 21 visit, she reported normal fetal movements to clinic personnel on her visits of October 30, November 6, and November 13, 1992.

Dunn noticed a cessation of fetal movement after 6:00 p.m. on November 19, 1992. She did not call the clinic because she had a regular appointment scheduled the next morning and because family members told her that a fetus has less room to move as it grows.

Dunn returned to the clinic for a regularly scheduled appointment at 9:30 a.m. on November 20, 1992. She testified that although she told a person at the front desk that she was feeling no fetal movement she waited for 30 minutes before she was seen by Dr. Tucker.

Dunn told Dr. Tucker about the cessation of fetal movement. Dr. Tucker attempted to find a fetal heartbeat using a hand-held Doppler device. When she was unable to detect a heartbeat, she tried again with a portable ultrasound which was wheeled into the room. When asked by Dr. Tucker why she failed to call the hospital when she noticed a decrease in fetal movement, Dunn said that family members told her that the baby stopped moving because she was about to go into labor.

Upon failing to locate a fetal heartbeat with the portable ultrasound, Dr. Tucker transferred Dunn to the clinic's ultrasound laboratory. Although Dr. Tucker suspected that Dunn's baby had died *in utero,* the larger ultrasound showed a fetal heart rate of 60 beats per minute, which is low. After approximately two minutes the heart rate jumped to 120. At this point, Dunn was transported across the street to the Hospital where an emergency caesarean section was performed by Dr. David Miner (Dr. Miner).

Kevin was born at 11:58 a.m. Kevin's condition was poor due to the fact that the umbilical cord was wrapped around his neck, arm, and leg. Kevin sustained serious brain damage as well as other physical problems and now requires around-the-clock care.

Dunn filed suit against the Hospital, Drs. Tucker and Turnquest, and the Foundation on December 28, 1995, in her

capacity as Kevin's guardian.[1] In both her original and subsequently amended complaints, Dunn alleged that the various Appellees were negligent in their treatment of her and Kevin. Welsh was substituted as plaintiff over the Appellees' objections by order of the trial court entered January 13, 1999.

On March 11, 1999, the trial court entered a directed verdict in favor of Dr. Tucker, finding that "there is no evidence in the record in this case which raises a jury issue on the allegation of negligence on the part of Dr. Tucker." On March 15, 1999, the trial court entered judgment in favor of the remaining Appellees following a jury trial which resulted in a verdict in their favor. This appeal followed.

 I. DID THE TRIAL COURT ERR IN REFUSING TO ALLOW WELSH'S EXPERT WITNESSES, PATRICIA FEDORKA AND DR. MAX LILLING, TO TESTIFY THAT THE FACT THAT THE NURSE DIRECTOR OF THE CLINIC WAS UNLICENSED HAD A NEGATIVE IMPACT ON KEVIN'S OUTCOME?

In its November 1, 1996, responses to interrogatories propounded by Welsh, the Foundation identified "Susan Stipe, R.N." as the "nurse manager" of the clinic on the day Kevin was born. The interrogatories were signed by Kathy Wade (Wade) on behalf of the Foundation and by Michael Kirk (Kirk) in his capacity as counsel for the Foundation. In later responses to interrogatories which were filed on April 28, 1997, the Foundation identified "Susan Stipe" as one of the persons responsible for teaching and training medical assistants. These responses were also signed by Wade and Kirk. Counsel for Welsh never questioned the discrepancy in the two responses prior to trial.

Stipe testified by deposition and at trial. In regard to her educational and work background, Stipe testified as follows at her deposition:

Q: Tell us a little bit about your background. You're a registered nurse.

A: Uh-huh.

Q: Yes?

A: Yes.

Q: Okay, and where did you take your training?

A: St. Luke's.

Q: Okay. And then where did you go after you got your nursing degree?

A: I got a degree from KU, University of Kansas.

Q: Okay. And so you got a B.S. degree.

A: No. Just a regular B—well, I have a B.S., but it's not in nursing.

Q: Okay. I got it. And where did you go from there?

A: I practiced—or I did nursing in clinics.

Q: Okay.

A: And then I worked for an OB–GYN group in Kansas City.

Q: Okay.

A: And then from there we moved to Des Moines, Iowa, and I worked for an ENT physician in Des Moines, Iowa, for two years, and then we moved here and I went to work for the foundation.

Q: Okay. And when did you go to work for the foundation?

A: I—it was either June or July of '92.

Q: And how long did you work with the foundation?

A: About a year.

---

1. The remaining Appellees were added at a later date.

Q: Okay. And now are you working as an RN now?

A: No.

. . . .

A: No. I'm executive director for Kentucky Eye Care.

Stipe also testified that she did nursing work in labor and delivery in Kansas and/or Missouri.

Stipe testified that her duties as clinic director included oversight of medical assistants and daily operations of the clinic. Stipe was questioned throughout her deposition as to the procedure used at the clinic if a patient like Dunn reported to the receptionist that she was experiencing decreased fetal movement. According to Stipe, in that situation the receptionist was trained to ask the patient if she had called in, tell her to take a seat, pull the patient's chart, and then take it to either Stipe or one of the residents STAT. The receptionists were supervised and trained through the clinic's business office. Stipe stated that it would be reasonable for this procedure to take 15 minutes. In Dunn's scenario, Stipe estimated that it would take approximately one-half hour for her to have been seen by a doctor.

On December 11, 1997, and January 14, 1998, the Hospital deposed Patricia Fedorka, Ph.D. (Fedorka).[2] The basis of Fedorka's testimony was that the nurses, medical assistants, and receptionists in the clinic deviated from accepted standards of care, and specifically that "Nurse Stipe" deviated from accepted standards of care for a registered nurse. Fedorka also testified that the medical assistants were improperly trained by Stipe, whom she identified as having responsibility for their training, and that they failed to follow their own established policies and procedures.

On August 20, 1997, Welsh filed his CR 26.02 expert witness disclosure with the trial court. Fedorka was identified as an expert, and her anticipated testimony was that "the nurses working in the clinic deviated from the acceptable standards of nursing care and practice in the care of patients." The disclosure was supplemented on January 9, 1998, to show that she would testify that "the physicians, nurses, medical assistants and receptionists working in the clinic and hospital deviated from the acceptable standards of nursing care and practice in the care of patients." There were no further supplements pertaining to Fedorka's expected testimony.

Welsh amended his CR 26.02 disclosure again on August 4, 1998, to add Dr. Max Lilling (Dr. Lilling) as an expert witness. Dr. Lilling's anticipated testimony was that "the physicians, nurses and medical assistants deviated from the acceptable standards and practice in the care of the two patients. . . . There was inadequate training and supervision of staff residents, nurses and medical assistants, one or more of which did not respond in a timely manner either directly or through their staff." [3] There were no further supplements pertaining to Dr. Lilling's expected testimony.

Welsh subpoenaed Stipe to testify as a witness. Approximately three weeks prior to trial, Mikell Grafton Skinner (Skinner), one of Welsh's trial attorneys, met with Stipe. During this meeting, Stipe informed Skinner that she was not an RN. Neither Skinner nor Jack Beam, Welsh's other trial counsel, dispute the fact that Stipe informed Skinner that she was not an RN. It is also apparent that neither Beam nor Skinner informed opposing

---

2. The record only contains the December 11, 1997, deposition.

3. The deposition of Dr. Lilling is absent from the record on appeal.

counsel or the trial court of Stipe's disclosure immediately after becoming aware of the fact.

Kirk contacted Stipe prior to trial to ask if she had been subpoenaed by Welsh. Stipe advised that she had been, and also told Kirk that she had not been provided with a copy of her deposition testimony. Five days prior to trial, Kirk met with Stipe after she had reviewed her deposition. At this meeting, Stipe told Kirk she was not an RN. Stipe also told Kirk that she had told Skinner she was not an RN. Despite being advised by Stipe that she was not an RN, Kirk took no steps to either amend the Foundation's prior discovery responses or inform the trial court of Stipe's disclosure.

Drs. Potts, Pasic and Gall were represented at trial by W. Kennedy Simpson (Simpson). Simpson maintains in his brief on appeal that he was not aware prior to trial that Stipe was not an RN. Kirk advised Simpson during *voir dire* that Stipe may not have been licensed as an RN in Kentucky, but Simpson maintains that he believed Stipe was licensed as an RN in another state.

At trial, Welsh called Dr. Gall as a witness. While Welsh was establishing the chain of command at the clinic, the following line of questioning ensued:

> Q: What about—was her name Susan Dee Stipe?
>
> A: Right, she was a nurse.
>
> Q: Was she a registered nurse?
>
> A: She was a registered nurse.[4]

Stipe took the witness stand immediately after Dr. Gall. Stipe admitted that she was not an RN. Counsel for Welsh used Stipe's deposition to impeach her, and the trial court also permitted Welsh to estab-

lish the fact through several other witnesses that Stipe was not an RN at the time she worked at the clinic.

After Stipe testified, Welsh presented the expert testimony of Fedorka and Dr. Lilling. Despite having failed to update his previous CR 26.02 disclosures, counsel for Welsh sought to have Fedorka and Dr. Lilling testify that the fact that Stipe was not an RN had a negative impact on the quality of care Dunn received at the clinic. The trial court refused to allow this testimony from both witnesses due to Welsh's failure to amend his previous CR 26.02 disclosures concerning the testimony of Fedorka and Dr. Lilling.

■ Welsh maintains in his brief on appeal that the trial court erred in refusing to allow Fedorka and Dr. Lilling "to testify that a non-RN did not know how to triage patients in an emergency, or how to implement clinic policies during prenatal care to ensure fetal well-being, which caused the delay in delivery." Welsh also contends in his brief that the trial court erred in its ruling despite the fact that:

1. Wade and Kirk had submitted an interrogatory stating that Stipe was an R.N.

2. Stipe had testified under oath in her deposition that she was an R.N.

3. Fedorka gave her deposition a year before plaintiff had any reason to suspect that the Kirk/Wade interrogatory was false or that Stipe had perjured herself.

4. Kirk admitted knowing that Stipe was not an R.N. before trial, but never disclosed this to plaintiff's counsel.

5. Simpson admitted knowing that Stipe was not an R.N. before *voir dire*,

---

**4.** Welsh argues on appeal that Dr. Potts also testified that Stipe was an RN, but the citation

provided to the trial videotape is incorrect.

but never disclosed this to plaintiff's counsel.

6. At trial, Simpson permitted his client Gall to testify under oath (when he testified in plaintiff's case) that Stipe was a[sic] R.N.

Conspicuously absent from Welsh's argument on appeal is the fact that the record clearly shows that counsel for Welsh first discovered that Stipe was not an RN and failed to tell anyone. The record makes it abundantly clear that no one involved with this case had any reason to doubt Stipe's deposition testimony until she admitted to Skinner that she was not an RN three weeks prior to trial.

Once counsel for Welsh discovered that Stipe was not an RN and decided to have his experts testify that this fact had a negative impact on either the treatment Dunn received on the day Kevin was born or Kevin's condition at birth, it was his responsibility to indicate this change in testimony through supplemental CR 26.02 disclosures. Had Welsh done so, counsel for the Appellees would have had an opportunity to prepare for and defend against this new theory. Had the trial court admitted this testimony into evidence, prejudice would have resulted to the Appellees in that they would have been completely unprepared to respond to it. The fact that Kirk knew Stipe was not an RN five days prior to trial and that Simpson may or may not have been aware of Stipe's change in testimony makes no difference. The fact that counsel for Appellees learned that Stipe was not an RN five days prior to trial does not automatically place them on notice that Welsh intended to use this evidence to elicit testimony from his experts regarding areas that were not included in the scope of their previous depositions.

We see no fault with the fact that Simpson "allowed" Dr. Gall to state while testifying on Welsh's behalf that Stipe was an RN. It has been shown that while Simpson was operating under the assumption that Stipe was not licensed as an RN in Kentucky, he did not know she was not an RN until she stated as such in her trial testimony. Additionally, as Welsh points out in his brief on appeal, Dr. Gall stated while testifying in his own defense that "he had 'heard something about Stipe not being licensed in Kentucky'."

Finally, Welsh would have us reverse the trial court's ruling on this matter due to the fact that Kirk violated CR 26.05(b) by failing to supplement the Foundation's discovery responses once he learned that Stipe was not an RN. While we agree that Kirk was under an obligation to supplement his prior responses once he learned that Stipe was not an RN, this technical argument does nothing to negate the fact that counsel for Welsh was aware of this fact at least two weeks before Kirk, and that Kirk knew that counsel for Welsh already knew that Stipe was not an RN. As no prejudice resulted to Welsh by Kirk's failure to comply with CR 26.05(b), this does not constitute grounds for reversal.

II. DID THE TRIAL COURT ERR IN EXCLUDING THE OPERATIVE REPORT PREPARED BY DR. MINER AND IN DIRECTING A VERDICT IN FAVOR OF DR. TUCKER?

As we noted in our initial discussion of the facts, Dr. Tucker was the first doctor to see Dunn on the day Kevin was born. Dr. Tucker testified that she saw Dunn on November 20, 1992, for a routine visit.[5] Dunn told her she had experienced no fetal movement since November 19. Dr. Tuck-

---

5. Dr. Tucker's testimony consisted of the reading of her deposition at trial.

er attempted to locate a fetal heartbeat with a hand-held Doppler unit. Dr. Tucker recorded the fact on Dunn's medical chart that she could not locate a fetal heartbeat with the Doppler unit. She next attempted to locate a fetal heart beat with a portable ultrasound. When that also failed, Dr. Tucker transported Dunn to the clinic's ultrasound laboratory. Dr. Tucker stated that the technician established a fetal heartbeat in the 60s. Dunn was turned onto her left side, and after approximately two minutes the fetal heartbeat increased to the 120s. At that point, she transferred Dunn to the Hospital's labor and delivery department.

Dr. Miner delivered Kevin by emergency caesarean section. Dr. Miner stated as follows in his operative summary:

INDICATIONS: The patient is a 19–year–old primigravida white female who has been followed by the Clinic and is at 39 5/7 weeks. *She was seen in Clinic today and noted to have fetal heart rate deceleration and bradycardia on Doppler in Clinic. She was taken for ultrasound and was noted to have a fetal heart rate of 60.* [emphasis added] She was taken to Labor and Delivery where she was placed on the monitor and fetal heart rate was in the 120's with decreased variability and late decelerations repetitively. The patient was not responsive to 02, IV fluids and left lateral tilt. Therefore, she was taken for primary low transverse caesarean section for repetitive late decelerations.

Dr. Miner testified as follows in his deposition in regard to the above-emphasized portion of the operative summary:

Q: You—there's some history there and you—you wrote that she was seen in the clinic today, noted to have fetal heart rate decelerations and bradycardia on Doppler in the clinic. Did that—to the best of your recollection, did that history probably come from your conversation with Doctor Tucker?

A: I'm not sure where it came from. It came from the clinic, but it could be Doctor Tucker, it could be a medical student, I'm not sure. I don't write down where that came from.

Based on Dr. Miner's operative summary, Welsh sought to elicit testimony from Dr. Lilling that if Dr. Tucker had found a fetal heart rate of 60 on the Doppler unit, she deviated from the accepted standard of care by transferring Dunn to the Clinic's ultrasound laboratory instead of directly to labor and delivery. The trial court refused to allow this testimony on the ground that the operative report was not trustworthy. On cross-examination, Dr. Lilling testified that he had no quarrel with Dr. Tucker's examination of Dunn as it was recorded in the medical records, and that if what Dr. Tucker said happened was true, she did not deviate from the standard of care. The trial court ultimately grated a directed verdict in favor of Dr. Tucker.

 Welsh contends that Dr. Miner's operative summary "was a part of the medical record and admissible under KRE 803(6)." [6] Under KRE 803(6), records of a regularly conducted activity are not excluded by the hearsay rule "unless the source of information or the method or circumstances of preparation indicate lack

---

**6.** Welsh also refers to KRE 803(b), but it is unclear whether this is a typographical error or a reference to KRE 803(6)(B), which deals with the admissibility of an opinion contained in records of a regularly conducted activity.

As there is no allegation that the disputed portion of the operative summary is Dr. Miner's opinion, we will not address any KRE 803(6)(B) concerns.

of trustworthiness." We note at the outset that the decision whether to admit evidence is vested in the sound discretion of the trial court and will not be reversed absent a showing of an abuse of discretion. *Young v. J.B. Hunt Transportation, Inc.*, 781 S.W.2d 503, 509 (1989).

Records of a regularly conducted business activity are not automatically admissible under the hearsay exceptions of KRE 803 merely because they are records of a regularly conducted business activity. As the language of KRE 803(6) provides: "the element of "trustworthiness" ... must be present in order for documents, records or reports to qualify for admission into evidence under the exception created for business records". [Citations omitted.] It is this element "which the law considers a substitute for the oath of the declarant, observation of his demeanor by the jury, and his cross-examination by the party against whom the hearsay is offered".

*G.E.Y. v. Cabinet for Human Resources*, Ky.App., 701 S.W.2d 713, 715, *citing Buckler v. Commonwealth*, Ky., 541 S.W.2d 935, 937 (1976).

Dr. Tucker testified that she detected no fetal heartbeat with the Doppler unit. She stated that she wrote "Could not locate fetal heart tones with Doppler" in Dunn's medical chart. In regard to what she told Dr. Miner, Dr. Tucker testified as follows:

Q: Now, do you have a recollection, independent recollection, of what you told Dr. Miner?

A: I do not have a recollection of what I told him. I know what I usually tell people when I am sending somebody over to labor and delivery whether it's STAT or otherwise. I give a gestational age, I give the situation and all the information that is essentially at my—that I have available to me then.

Q: Did you tell Dr. Miner that there was a fetal heart tone for two minutes in the 60s?

A: Yes, I did.

Q: And do you recall anything that he said in response to that or anything else you said to him?

A: I would have told him the heart tones—that I couldn't find them in the clinic, that I found them in the ultrasound department, they were in the 60s for two minutes, maybe longer, since I didn't know how long it had been in the 60s when I started, they had come back up and she was en route.

Dr. Miner's operative summary states that fetal heart tones were established by Doppler, which directly contradicts Dr. Tucker's testimony. Dr. Miner was unable to testify as to where this information came from. Based on the foregoing, we are not persuaded that the trial court abused its discretion in finding the operative summary and Dr. Lilling's testimony related thereto to be inadmissible.

The same result was reached in *Ricciardi v. The Children's Hospital Medical Center*, 811 F.2d 18 (1st Cir.1987). In that case, the plaintiff was injured during an operation to repair an aortic valve. He was seen in consultation following his surgery by Dr. Nirmel. Dr. Nirmel was not present during the operation. The three-page handwritten consultation report prepared by Dr. Nirmel stated that "during surg. episode of aortic cannula accidentally out × 40–60 secs." Although Dr. Nirmel testified that he normally speaks to the medical staff present before, during, and after surgery, he admitted that he did not have personal knowledge of the cannula episode and that he didn't remember who told him about it. Dr. Nirmel's written notation was the grounds for the plaintiff's

claim that the cannula episode caused an air embolus to be released into his blood stream. In ruling that Dr. Nirmel's notation could not be entered into evidence, which resulted in the entry of a directed verdict against the plaintiff, the Court stated:

> To be admissible under Rule 803(6), the entry in the record must be the opinion or diagnosis of the physician who made it or of some other "person with knowledge." In *Petrocelli v. Gallison,* 679 F.2d 286 (1st Cir.1982), this court considered the admissibility of parts of a hospital record describing an event during an operation the patient underwent several months earlier and containing the patient's description of the cause of his pain. It was unclear whether the information originated from the reporting doctors or from the patient or his wife. *Id.* at 290. We said:

> > Given the impossibility of determining from the records themselves whether these reports reflected medical judgments, and the lack of any corroborative evidence or testimony offered by the plaintiffs to assure the court that these were professional opinions, the district court could reasonably determine that the notations were simply too inscrutable to be admitted, bearing in mind that, if admitted under Rule 803(6), they would be admitted for their truth without any opportunity to cross-examine the physicians who made them.

*Id.* at 291. Although Dr. Nirmel's entry did not concern an event occurring before the alleged malpractice, and there is no indication that the patient himself provided the information, the note suffers from the same critical deficiency as the entries in *Petrocelli;* the source of the information is unknown.

Furthermore, a record is not admissible under the federal rule if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Fed.R.Evid. 803(6). An unknown source is hardly trustworthy.

*Ricciardi,* 811 F.2d at 22–23. Like *Ricciardi,* Dr. Miner was not present when Dr. Tucker examined Dunn and he does not recall who told him that a fetal heartbeat was detected with the Doppler unit. Thus, the same result can be reached in this case.

■ In so ruling, we have seriously considered Welsh's argument pertaining to the fact that "the applicability of the [business record] exception is not adversely affected by a lack of knowledge by the maker of the record." Lawson, *The Kentucky Evidence Law Handbook,* Sec. 8.65, p. 464–465 (3rd ed.1993). However, we believe that where the purported declarant of a statement contained in a business record testifies contrary to the statement contained in the record itself, the trustworthiness of the record has been called into question and the trial court would not be abusing its discretion in excluding the record from the evidence should the situation so warrant.

■ As Welsh concedes in his brief on appeal, any liability of Dr. Tucker was derivative from the operative summary. "In ruling on ... a motion for a directed verdict a trial court ... is precluded from entering ... a directed verdict ... unless there is a complete absence of proof on a material issue in the action[.]" *Taylor v. Kennedy,* Ky.App., 700 S.W.2d 415, 416 (1985). Absent Dr. Miner's operative summary, there was nothing on which Welsh could base his claim of negligence against Dr. Tucker. Thus, the trial court did not err in directing a verdict in her favor.

III. DID THE TRIAL COURT ERR (1) IN INSTRUCTING THE JURY THAT IT COULD CONSIDER AND APPORTION FAULT TO DUNN; AND (2) IN IMPUTING ANY NEGLIGENCE ON THE PART OF DUNN TO KEVIN?

■ Welsh argues that the trial court improperly instructed the jury that it could consider negligence on the part of Dunn and apportion fault to her. Welsh also maintains that by allowing testimony pertaining to "negative conduct" on behalf of Dunn, the trial court impermissibly imputed any negligence on the part of Dunn to Kevin. We disagree.

Instruction/Interrogatory Nos. 1–6 pertained to the negligence of the Appellees herein. At the end of Instruction/Interrogatory No. 6, the jury was instructed that it could return to the courtroom if it answered all of the previous interrogatories in the negative. The jury was further advised that if it had answered any of the previous interrogatories in the affirmative, it was to continue to Instruction/Interrogatory No. 7, which stated as follows:

### Instruction No. 7

At the time and place about which you have heard evidence, it was the duty of Tambra Dunn to exercise that degree of care which is ordinarily expected of a reasonable and prudent pregnant woman acting under the same or similar circumstances.

### Interrogatory No. 7

Do you believe from the evidence presented in this case that Tambra Dunn failed to comply with this duty and that such failure was a substantial factor in causing the injuries to Kevin Singer, II?

Under Instruction/Interrogatory No. 8, the jury was directed to apportion percentages of fault to the various parties in the case, including Tambra Dunn.

Even if we were convinced that this constituted error on behalf of the trial court, it did not result in prejudice to Welsh or impute Dunn's negligence to Kevin. As we noted earlier, the jurors never considered whether Dunn was negligent because they never reached Instruction/Interrogatory No. 7.

IV. DID THE TRIAL COURT ERR IN EXCLUDING EVIDENCE THAT DUNN'S FMCS AND CLINIC TIME STUDIES HAD BEEN DESTROYED?

■ As we discussed earlier, Dunn was periodically given FMCs on which to record the number of fetal movements she experienced over a certain time period. Dunn testified that she used the FMCs as she was instructed, that the number of movements she recorded was within allowable limits, and that she gave the FMCs to the doctors during her visits to the clinic. At trial, some clinic employees testified that FMCs were part of a patient's record, some testified they were not. No one testified that Dunn's FMCs were made a part of her medical record. When Dunn sought production of her FMCs, they could not be found. There was no evidence that the Appellees purposefully destroyed the FMCs to prevent Dunn from discovering them.

From time to time, the clinic performed time studies to track the flow of patients through the clinic and to determine the length of time between check-in and checkout. Dr. Gall testified during his deposition that once he reviewed the time studies, he threw them away. There was no evidence that a time study was done while Dunn was a patient at the clinic. When Welsh sought production of time study reports from the Foundation, there were

none to produce. There was no evidence that the Appellees destroyed any time study which may have been relevant to this case for the purpose of concealing it from Dunn.

Prior to trial, the Foundation filed a motion *in limine* seeking to preclude Welsh from alleging at trial that the Foundation destroyed the FMCs and time studies. On February 9, 1999, the trial court entered an order granting the Foundation's motion, stating:

> Plaintiff and his attorneys are prohibited from commenting and alleging before the jury that the Defendant Foundation destroyed the fetal movement cards of Tambra Dunn assuming all medical experts agree that the damage to Kevin Singer began not more than five (5) days before his birth. If, however, there is testimony that damage may have occurred during the time she kept and allegedly returned the fetal movement cards, the Court will revisit its ruling herein.
>
> It is further ordered that the motion of [the Foundation] shall be, and it is hereby granted, and Plaintiff and his attorneys are prohibited from commenting and alleging before the jury that the Defendant Foundation destroyed the time studies conducted by the Defendant Foundation subject to further review during trial if Plaintiff is able to establish a foundation for relevancy.

Welsh maintains that the trial court erred in refusing to allow him to present evidence that the FMCs had been destroyed. Welsh argues that the FMCs would have shown that Dunn cooperated. We disagree. Dunn testified that she properly used and returned the FMCs and no evidence was presented or argument made to the contrary. All the FMCs would have shown is that Dunn cooperated to the extent that she completed and re-turned the FMCs. They would not be relevant for the purpose of showing that she cooperated with any other instructions. Additionally, as counsel for the Foundation illustrates in its brief on appeal, both of plaintiff's experts who testified regarding causation stated that the majority of Kevin's brain damage occurred in the hours preceding his birth, and not when Dunn returned the FMCs on October 7 and October 21, 1992. The trial court did not err in refusing to allow Welsh to comment on the destruction of the FMCs at trial.

In regard to the time studies, Welsh maintains that they would have corroborated Dunn's testimony regarding how long she waited to see a doctor the day Kevin was born. As the trial court found that the time studies were not relevant, we again note that the decision as to whether to admit or exclude evidence is vested in the trial court and will not be reversed absent abuse of that discretion. *Young,* 781 S.W.2d at 509. We find that no abuse occurred in regard to the time studies. There was no evidence that any time study was done while Dunn was a patient at the clinic, and any previous or subsequent time study would have been irrelevant as to how long she waited to be seen on any given date while she was a patient at the clinic. Second, no one disputed Dunn's testimony that she waited 30 minutes to see a doctor on the day Kevin was born. Thus, the trial court did not abuse its discretion in refusing to allow Welsh to comment on the destruction of the time studies.

Welsh's reliance on *Baylis v. Lourdes Hospital,* Ky., 805 S.W.2d 122 (1991), and *McGowan v. Cooper Industries,* 863 F.2d 1266 (6th Cir.1988), is misplaced. *Baylis* deals with the admissibility of medical records into evidence as opposed to the destruction of evidence. *McGowan* addressed preclusion of testimony pertaining

to the routine business practices, which is not the issue in question. The trial court's order on this matter was not erroneous.

## V. DID THE TRIAL COURT IMPERMISSIBLY LIMIT WELSH'S CROSS EXAMINATION OF DR. JEFFREY PHELAN?

At trial, Dr. Jeffrey Phelan (Dr. Phelan) testified that for all intents and purposes Kevin Singer died *in utero* around 6:00 p.m. on November 19, 1992, and resuscitated *in utero* around 11:00 a.m. on November 20, 1992, when a heartbeat was detected on ultrasound. This was an event which Dr. Phelan stated he had seen a number of times. Upon establishing that Dr. Phelan believed that Kevin was dead for 17 hours and then resuscitated, Beam launched into the following line of questioning:

Q: And you believe that he was, basically, like Lazarus who came back from the dead? Isn't that what you said? [7]

A. Yes sir, I said that and I say it today.

Q: And so you are saying that he died on November 19, 1992, and rose from the dead like Lazarus, is that right?

A: Correct.

Q: You're saying that you believe it was a miracle that Kevin came back to life just like Lazarus, is that right?

A: Yes sir, I said that and I believe it today.

Q: And you said that we should call this child Lazarus, didn't you?

A: That's what I nick-named him, yes. I believe he is a miracle child.

Q: Do you believe that he came back to life in the ultrasound lab at approximately 10:58, is that right?

A: That's when they found the heart rate again, yes sir.

Q: Doctor, do you know the story of Lazarus?

A: About—from that perspective that Christ went back in and raised Lazarus from the dead.

Q: And Lazarus was dead for four days, wasn't he?

A: I don't know the total days, but it was a lot longer than Kevin Singer.

Q: Well you've come into this court and compared my client to Lazarus, haven't you?

A: Yes.

Q: Why don't you tell us what happened to Lazarus?

A: I don't remember the details in the Bible, other than Christ raised Lazarus from the dead.

Q: Well, let me see if I can fill in some gaps for you and see if you agree.

A: Okay.

At this point, an objection was made on the ground that it was improper for Beam to "testify" to details concerning the Bible's account of the resurrection of Lazarus once Dr. Phelan stated that he didn't know the specific details of the Biblical story. Beam argued that the questions were proper because Dr. Phelan had compared Kevin to Lazarus. The trial court sustained the objection, but indicated that Beam could ask one more question regarding Lazarus. The following ensued:

Q: Are you aware, Doctor, that in the book of John ... that after Jesus rose [sic] Lazarus from the dead

---

7. Apparently Dr. Phelan used the Lazarus analogy during his deposition. The record does not contain a copy of Dr. Phelan's deposition.

that Lazarus's sister Martha served dinner to Lazarus and Jesus?

A: I don't recall.

Q: Did you know that Lazarus was healthy and not blind? Did you know that?

Upon objection, the trial court again advised Beam that he could not educate Dr. Phelan or the jury about the story of Lazarus. When the Appellees' counsel agreed that they had no objection to Beam asking Dr. Phelan whether or not Lazarus was brain damaged, Beam asked one more question:

Q: You know this much, Doctor, that Lazarus was a healthy person after Jesus raised him from the dead? Do you know that?

A: Yes, sir.

Beam never argued that the trial court's sustaining of the objection was a limitation on the scope of his cross-examination of Dr. Phelan. Nor did Beam argue that the trial court's actions kept him from exploring the specifics of Dr. Phelan's opinions under the dictates of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), or *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). From our review of the trial videotape, the only way the trial court limited Beam's cross-examination regarding Lazarus was that he could not advise Dr. Phelan in regard to the specifics of the story after he admitted he did not know them. As this alleged error was not properly preserved on appeal, we need not discuss it any further.

VI. DID THE TRIAL COURT GIVE AN IMPROPER JURY INSTRUCTION ON THE ISSUE OF CAUSATION?

In Instruction/Interrogatory Nos. 1–6, the jury was asked to decide whether the various Appellees breached their respective duties and whether that breach "was a substantial factor in causing the injuries to Kevin Singer, II." Welsh maintains in his brief on appeal that the Instructions/Interrogatories should have instructed the jury to rule in his favor if the Appellees' "failure to comply with their duty was a substantial factor in causing the event which results in the injury, not the injury itself." We disagree.

Welsh's entire case against each and every one of the Appellees was that they failed in their duty to deliver Kevin within a reasonable period of time once Dunn came to the clinic and told the receptionist that fetal movement had ceased the night before. We believe that the instructions ultimately given by the trial court accurately reflect Welsh's cause of action in that they ask the jury to determine whether the failure of the appellees to deliver Kevin within a reasonable period of time "was a substantial factor in causing the injuries."

Welsh's reliance on *Deutsch v. Shein,* Ky., 597 S.W.2d 141 (1980), and *NKC Hospitals, Inc. v. Anthony,* Ky.App., 849 S.W.2d 564 (1993), is misplaced. At first glance, those cases do appear to support Welsh's argument that the jury instructions should have used the language Welsh urges on appeal. However, the facts of *Deutsch* and *Anthony* require a different result.

In *Deutsch,* the plaintiff was hospitalized to determine the cause of her nausea and weakness. The defendant doctor submitted the plaintiff to numerous x-rays without first performing a pregnancy test. When plaintiff later learned she was pregnant at the time the x-rays occurred, she made the agonizing decision to terminate her pregnancy due to her fears that the radiation had damaged the fetus. In ex-

plaining the jury's decision, the Court noted:

> The jury found that Dr. Shein failed to use that degree of care and skill which is expected of a reasonably competent practitioner specializing in internal medicine, acting in the same or similar circumstances, by not obtaining a pregnancy test before Mrs. Deutsch was administered x-rays. The jury further found, however, that Dr. Shein's failure to obtain a pregnancy test, coupled with the administering of x-rays, was not a substantial factor in causing the injury of which Mrs. Deutsch complained.

*Deutsch*, 597 S.W.2d at 143. The Court found that it was erroneous for the jury to find that the doctor's actions were not a substantial factor in causing the plaintiff's injury once it had decided that he was negligent in failing to administer the pregnancy test. In so holding, the Supreme Court stated:

> [t]he jury's finding in the negative was encouraged by the use of "substantial factor in causing the injury of which Mrs. Deutsch complained" in the instructions. Our use of the substantial factor test . . . shows the test applies to the event which results in the injury, not the injury itself. [Citations omitted.] The injury need only flow directly from the event.

*Id.* at 145. Stated another way, the Court recognized that the x-rays, and not the doctor's failure to perform a pregnancy test, were what caused the injury. Therefore, since the x-ray caused the injury, the jury had no choice but to absolve the doctor under the instruction as it was given. Thus, the jury should have been instructed to find for the plaintiff if it determined that the doctor's failure to administer a pregnancy test was a substantial factor in causing the event that led to the injury.

The same result was reached in *Anthony*, which clarified that the type of instruction sought by Welsh in this case is only to be used in cases involving superseding/intervening causes. In *Anthony*, the plaintiff's wife, who was pregnant, came to the hospital with complaints of nausea, vomiting, and abdominal pain. Her obstetrician, who was called several times and advised as to the severity of pain, merely prescribed antibiotics and pain medication and ordered that she be discharged. One of the nurses caring for the plaintiff's wife was of the opinion that she should not be discharged, and she reported her concerns to other hospital personnel. However, the plaintiff's wife was discharged without even being seen by a physician. She was later re-admitted to the hospital the same day and ultimately died three weeks later from complications stemming from delay in diagnosis of appendicitis and subsequent rupture of the decedent's appendix. At trial, one of the plaintiff's experts testified that the hospital breached its duty of care by discharging the plaintiff without first having her examined by a doctor. The jury was instructed on the negligence of both the decedent's doctor and the hospital. After the plaintiff settled with the doctor, the jury returned a verdict against the hospital.

On appeal, the hospital argued that the trial court erred in refusing to grant a directed verdict in its favor because (1) there was a lack of causation between its negligence and the decedent's death; (2) its expert testified that it was not negligent after the decedent was re-admitted; and (3) that the negligence of the decedent's obstetrician continued after she was re-admitted. In affirming, this Court stated:

> A superseding cause is an intervening independent force; however, an intervening cause is not necessarily a superseding cause. We say that, if the

resulting injury is reasonably foresee-able from the view of the original actor, then the other factors causing to bring about the injury are not a superseding cause.... Such train of thought is in keeping with [Deutsch].... *Deutsch* es-tablished: "Liability for a negligent act follows a finding of proximate or legal cause," which is conduct based on a sub-stantial factor in bringing about the harm.

. . . .

The hospital's superseding cause argu-ment pales when considering the state-ment in *Deutsch* that, "injury need only flow directly from the event." The hos-pital, in our opinion, could readily fore-see that injury would directly flow from Dr. Hawkins' negligent conduct, and the hospital had all the time and means to correct it.

*Anthony,* 849 S.W.2d at 568–569. Thus, we find no error in the trial court's instruc-tions.

### VII. WAS WELSH PREJUDICED BY THE TRIAL COURT'S DE-LAY IN RULING ON A MO-TION *IN LIMINE?*

■ On February 12, 1999, four days prior to trial, Welsh filed a motion *in limine* asking the trial court to preclude the Appellees from mentioning Dunn's use of "legal or illegal cigarettes" during her pregnancy. In support of his motion, Welsh argued that none of the experts linked Dunn's use of cigarettes during her pregnancy to Kevin's condition.

Before *voir dire* began, Welsh asked the trial court to rule on his motion. The Appellees did not object to Welsh's motion in regard to Dunn's use of marijuana, but maintained that evidence of Dunn's contin-ued use of cigarettes during her pregnancy was relevant to the issue of her failure to follow instructions; i.e., her failure to call the clinic or Hospital when her baby stopped moving. The trial court informed the parties that it would consider Welsh's motion during bench conferences before any expert offered an opinion on the con-tested issues. Welsh argues that in refus-ing to rule on his motion prior to *voir dire*, the trial court forced him to question the jury pool regarding their beliefs on Dunn's smoking, thus prejudicing his case. Ap-parently the evidence concerning Dunn's use of cigarettes during pregnancy was not brought up at trial, and the only time Dunn's smoking was mentioned to the jury was during *voir dire.*

Having conducted an extensive review of the record and trial, we fail to see how Welsh was prejudiced during *voir dire* by his own mention of Dunn's use of ciga-rettes. The remarks concerning Dunn's use of cigarettes came at the beginning of a trial that spanned fourteen days involv-ing, by our count, twenty-nine witnesses. Having considered the record as a whole, we are not prepared to say that Welsh was prejudiced by the remarks of his own at-torney.

### VIII. DID THE TRIAL COURT ERR IN REFUSING TO ALLOW WELSH TO PRESENT EVI-DENCE PERTAINING TO THE CONDUCT OF DR. POTTS?

■ In 1992, seventeen clinic employ-ees signed a petition alleging that Dr. Potts's behavior in the clinic was unaccept-able. Julie Johnson, one of the medical assistants who saw Dunn on the day Kevin was born, testified at her deposition that Dr. Potts was hostile, vulgar and nasty. Another employee, Jean Blocker, testified that Dr. Potts made racist remarks, used foul language, and had a history of fon-

dling female employees.[8] According to Blocker, residents in the clinic had problems working with Dr. Potts, and she described how his behavior affected the quality of care offered by the clinic. However, Blocker also stated that she had no contact with Dunn while she was a patient at the clinic and that she was unaware of any problems between Dr. Potts and clinic employees which would have negatively impacted Dunn's care. Documents in Dunn's possession showed that Dr. Potts received a written and verbal reprimand, underwent counseling, and was urged to attend a discussion on harassment. However, Dr. Potts' annual review for 1993 contained the following notation:

> In September 1992, a complaint involving harassment was made by several clinic employees. This resulted in my discussion on December 23 with him regarding this behavior as well as counseling.... It was apparent, Dr. Potts' behavior was significantly improved and no further complaints were registered until the same employee registered a complaint in July 1993. Because of this, Dr. Potts has been temporarily removed from the [clinic] and will confine his activities to the Operating Room and to Fort Knox.

The Appellees' motion *in limine* seeking to preclude Welsh from bringing Dr. Potts's conduct and discipline to the attention of the jury was granted.

Welsh maintains in his brief on appeal that:

> Clinic Director Potts did not have a clue as to what "Nurse [sic] Stipe was teaching the front desk what to do when mom's [sic] like Tambra presented at the front desk with a complaint of no fetal movement."

What Welsh overlooks and what Dr. Potts points out in his appellate brief is that

> [t]here is no evidence that any resident or clinic employee who rendered allegedly negligent treatment upon Tambra Dunn was harassed by Dr. Potts, or that any medical care given to Tambra Dunn was in any way negatively influenced by Dr. Potts.

Furthermore, we agree that even if evidence pertaining to Dr. Potts' behavior had any relevance whatsoever, it was highly prejudicial and thus properly subject to exclusion under KRE 403.

## IX. DID THE TRIAL COURT ERR IN REFUSING TO GIVE AN AGENCY INSTRUCTION RELATING TO DR. TURNQUEST?

 Welsh maintains that the trial court erred in refusing to instruct the jury to find in his favor against the Hospital if the jury found that its agents, including Dr. Turnquest, failed to comply with any duty owed to Dunn. We disagree. Even if this was error, it does not require reversal as it did not result in prejudice to Welsh. Dr. Turnquest was absolved by the jury under Interrogatory No. 5. Absent a finding of liability in regard to Dr. Turnquest, there could be no liability on behalf of the Hospital.

## X. DID THE CONDUCT OF DEFENSE COUNSEL RESULT IN PREJUDICE TO WELSH?

 Welsh contends that there were several incidents of behavior on behalf of the various Appellees' attorneys which were prejudicial to his case. We note that the trial court "is vested with a large discretion in the conduct of the trial of causes and an appellate court will not

---

8. Blocker had previously prevailed in a jury trial on claims of sexual harassment, apparently stemming from Dr. Potts's behavior.

interpose to control the exercise of such discretion by a court of original jurisdiction, unless there has been an abuse or most unwise exercise thereof." *Transit Authority of River City (TARC) v. Montgomery,* Ky., 836 S.W.2d 413, 416 (1992). Having set forth the standard of review, we will address each claim separately despite the fact that many of these claimed errors were not preserved for our review.

 A. Kirk and Simpson failed to advise the trial court that Stipe perjured herself in her deposition testimony.

Having discussed this matter thoroughly in Section I, *supra,* we decline to discuss it again.

 B. Frank P. Doheny, Jr. physically grabbed Welsh's co-counsel.

In his appellate brief Welsh asserts that Frank P. Doheny, Jr. (Doheny), counsel for the Hospital, was guilty of "physically grabbing Mikell Grafton Skinner at the bench." In responding to the Hospital's claim that Welsh was exaggerating the contact between Doheny and Skinner, Welsh asserted that "Mr. Doheny did not "momentarily touch" … but, put his hands on Mikell Grafton Skinner's shoulders and physically moved her away from the bench."

A review of the incident in question shows that while one of the appellees' attorneys was making a motion during a bench conference, Doheny put *one* of his hands on Skinner's *elbow* and appears to have slightly tugged on it in an attempt to move closer to the bench. Skinner moved, said "Excuse me" to the court reporter, then looked at Doheny and said "Please don't touch me. Thank you." This incident was so minor that the attorney making the motion proceeded to do so while this conduct transpired. No objection to the physical contact was made. This is not grounds for reversal.

 C. Doheny cited the trial court to *Roberts v. Galen of Virginia, Inc.,* 111 F.3d 405 (6th Cir.1997) without telling the trial court that it had been reversed.

While Welsh is correct that the *Roberts* case was reversed by the United States Supreme Court in *Roberts v. Galen of Virginia, Inc.,* 525 U.S. 249, 119 S.Ct. 685, 142 L.Ed.2d 648 (1999), he neglects to inform *this* Court that *Roberts* was reversed for reasons other than the reason for which it was cited to begin with, thus this error certainly does not require reversal.

 D. Simpson threw a deposition.

During trial, counsel for Welsh made repeated allegations that counsel for the Appellees were somehow responsible for a missing deposition transcript. When Beam once again regaled the trial court with this allegation on the ninth day of trial while the jury was absent from the courtroom, Simpson threw a copy of the missing deposition approximately six feet onto Beam's table. Simpson immediately apologized. At this point, the trial court informed all attorneys that it would no longer entertain charges of attorney misconduct without supporting affidavits. Given the fact that the jury was out of the room when Simpson threw the deposition, we fail to see how this conduct prejudiced Welsh.

 E. Simpson failed to wear a suit coat in court.

Simpson asked for and received permission from the trial court to dispense with the wearing of a suit coat in the courtroom. As this Court is unaware of the existence of a mandatory list of acceptable courtroom attire, we will not address this issue.

F. Simpson walked to the visitor's gallery, put his foot on the bench seat, and conversed with his mother during closing arguments.

We do not believe Welsh was prejudiced by this behavior.

Simply put, these allegations of misconduct which occurred over the course of a 14 day trial do not, even when considered in their entirety, reach the level required for reversal.

We affirm the judgments of the Jefferson Circuit Court.

ALL CONCUR.