2003 VT 64

## Stephen L. Smith v. Thomas B. Parrott

[833 A.2d 843]

No. 02-322

Present: Amestoy, C.J., Dooley and Skoglund, JJ., and Allen, C.J. (Ret.) and Gibson, J. (Ret.), Specially Assigned

Opinion Filed August 1, 2003

*Norman E. Watts,* Woodstock, for Plaintiff-Appellant.

*Laura Q. Pelosi* and *John Davis Buckley* of *Theriault & Joslin, P.C.,* Montpelier, for Defendant-Appellee.

¶ 1. **Allen, C.J. (Ret.), Specially Assigned.** Stephen L. Smith, plaintiff in this medical malpractice action, appeals from a summary judgment of the Windsor Superior Court in favor of defendant Thomas Parrott, M.D. Plaintiff contends the trial court erred in: (1) finding that plaintiff had failed to show a probability that Dr. Parrott's negligence was the cause of his paralysis; and (2) rejecting plaintiff's theory of recovery based on a showing that Dr. Parrott's negligence had reduced plaintiff's chances of recovery, even if it was not the probable cause of his injuries. We affirm.

¶ 2. The undisputed material facts may be briefly summarized. On July 31, 1995, plaintiff awoke to find that he had no motor control over the use of his left foot. That afternoon he went to see Dr. Parrott, a family practitioner in White River Junction. Dr. Parrott noted that plaintiff had had two prior back surgeries, and described plaintiff's condition as a "[d]ramatic foot drop on the left side." Foot-drop is a neurological condition in which the motor functions of the foot and lower leg are diminished or terminated. Dr. Parrott referred plaintiff to a neurosurgeon.

¶ 3. Eleven days later, plaintiff was examined by Dr. Joseph Phillips, a neurosurgeon at Dartmouth-Hitchcock Medical Center. Dr. Phillips concluded that plaintiff's condition was complete or permanent, and that there was no possibility of any functional recovery. Plaintiff underwent surgery in early September to alleviate pain. His motor functions did not improve.

¶ 4. Plaintiff filed a medical malpractice action against Dr. Parrott, alleging that his failure to advise plaintiff of the need for an immediate neurological examination, and his failure to arrange such an examination, had resulted in the deterioration of plaintiff's condition to the point of permanence by the time he saw Dr. Phillips.* Following extensive discovery, Dr. Parrott moved for summary judgment, asserting that plaintiff had failed to adduce evidence that Parrott's

---

* Plaintiff also sued Dr. Phillips and two other physicians for malpractice, but voluntarily dismissed the claims.

conduct — even if below the standard of care — was the proximate cause of plaintiff's injuries. The motion cited Dr. Phillips' deposition testimony that plaintiff's foot-drop was complete two to three weeks before his neurological examination on August 11, and therefore that the delay in surgery had no impact on plaintiff's chances of recovery. Dr. Parrott also relied on the deposition testimony of plaintiff's expert witness, Dr. Donald Myers, who had initially opined that an earlier consultation with a neurosurgeon could have yielded a "50-50 chance" of "some recovery," but later amended his opinion to state that, in light of plaintiff's history of back surgery, the chance of some recovery was "a little bit" less than fifty percent.

¶ 5. In a written decision, the trial court granted the motion, finding that plaintiff had failed to show that his condition was more likely than not the result of Dr. Parrott's negligence, and rejecting plaintiff's effort to recover on a lesser showing under the so-called "loss of chance" doctrine. This appeal followed.

¶ 6. In reviewing a summary judgment we apply the same standard as the trial court, affirming the judgment only when the moving party has demonstrated that there are no genuine issues of material fact and the party is entitled to judgment as a matter of law, and resolving all reasonable doubts in favor of the party opposing the motion. *O'Donnell v. Bank of Vt.*, 166 Vt. 221, 224, 692 A.2d 1212, 1214 (1997). Plaintiff contends the trial court abused this standard in finding that he had failed to satisfy the traditional causation rule requiring evidence of a likelihood, or a greater than fifty percent chance, that Dr. Parrott was the cause of plaintiff's paralysis. Plaintiff relies on Dr. Myers' testimony that an earlier neurological examination would have yielded about a fifty-fifty chance of some recovery, asserting that the court should have erred on the high side. As noted, however, Dr. Myers modified his opinion to state that in plaintiff's case the chances of recovery were *less* than fifty percent. Thus, plaintiff failed to adduce evidence establishing the essential element of causation, and summary judgment was properly entered. See *Gallipo v. City of Rutland,* 163 Vt. 83, 86, 656 A.2d 635, 638 (1994) (summary judgment will be granted if, after adequate time for discovery, party fails to make showing sufficient to establish essential element of the case on which the party will bear burden of proof at trial).

¶ 7. Plaintiff also contends the trial court should have departed from the traditional causation standard to allow recovery based on evidence that Dr. Parrott's failure to procure an immediate neurological examination reduced plaintiff's chances of recovery, even

if the evidence failed to show a likelihood that it was the cause of his injuries. Plaintiff relies on the so-called "loss of chance" doctrine discussed in the legal literature and accepted in a growing number of states. As explained by its principal proponent, "[u]nder the loss-of-a-chance doctrine, the plaintiff would be compensated for the extent to which the defendant's negligence reduced the victim's likelihood of achieving a better outcome, notwithstanding the fact that the likelihood may have been reduced by less than fifty-one percent." J. King, *"Reduction of Likelihood" Reformulation and Other Retrofitting of the Loss-of-a-Chance Doctrine*, 28 U. Mem. L. Rev. 491, 493 (1998); see also Professor King's original seminal article, *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences*, 90 Yale L.J. 1353 (1981).

¶ 8. The loss of chance doctrine has received substantial support among academic commentators and has been accepted — in one form or another — in a growing number of jurisdictions, particularly in medical malpractice cases. See generally *Crosby v. United States*, 48 F. Supp. 2d 924, 926-28 (D. Alaska 1999) (providing comprehensive review of cases accepting and rejecting loss of chance doctrine); D. Fischer, *Tort Recovery For Loss of a Chance*, 36 Wake Forest L. Rev. 605, 607 (2001) (comparing applications in Great Britain and the United States); King, *supra*, 28 U. Mem. L. Rev. at 493 n.8 (listing articles relating to loss of chance doctrine); Note, *Loss of a Chance as a Cause of Action in Medical Malpractice Cases*, 59 Mo. L. Rev. 969, 973 n.29 (1994) (listing cases allowing recovery for loss of chance); see also Annotation, *Medical Malpractice: Measure and Elements of Damages in Actions Based on Loss of Chance*, 81 A.L.R.4th 485 (1990); Annotation, *Medical Malpractice: "Loss of Chance" Causality*, 54 A.L.R.4th 10 (1987). Supporters cite a number of policy arguments in favor of the doctrine, most notably the harshness of the traditional rule in denying recovery even in cases where a doctor's negligence may have significantly reduced the plaintiff's chances of recovery; the inherent worth of a chance of recovery, no matter how small, as a compensable interest; and the deterrent value in penalizing a poor prognosis, even if it reduced the plaintiff's chances of recovery by less than fifty percent. See, e.g., *Crosby*, 48 F. Supp. 2d at 928; *Wendland v. Sparks*, 574 N.W.2d 327, 330 (Iowa 1998); *Delaney v. Cade*, 873 P.2d 175, 180-83 (Kan. 1994); *Lord v. Lovett*, 770 A.2d 1103, 1106 (N.H. 2001); *Jorgenson v. Vener*, 2000 SD 87, 616 N.W.2d 366, 369; Note, *supra*, 59 Mo. L. Rev. at 984-85.

¶ 9. These cases and commentators notwithstanding, the traditional causation standard in medical malpractice — as in tort law generally — "still commands substantial support." King, *supra*, 28 U. Mem. L. Rev. at 505. Indeed, a significant number of jurisdictions have expressly rejected invitations to adopt the loss of chance doctrine to allow recovery where — as here — the defendant's negligence was not shown to have been the likely cause of injury. See, e.g., *Crosby*, 48 F. Supp. 2d at 930-32 (applying Alaska law); *Williams v. Spring Hill Mem'l Hosp.*, 646 So. 2d 1373, 1374-75 (Ala. 1994); *Grant v. Am. Nat'l Red Cross*, 745 A.2d 316, 322-23 (D.C. Ct. App. 2000); *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1020-21 (Fla. 1984); *Manning v. Twin Falls Clinic & Hosp., Inc.*, 830 P.2d 1185, 1189-90 (Idaho 1992); *Fennell v. S. Md. Hosp. Ctr., Inc.*, 580 A.2d 206, 211 (Md. 1990); *Fabio v. Bellomo*, 504 N.W.2d 758, 762-63 (Minn. 1993); *Jones v. Owings*, 456 S.E.2d 371, 374 (S.C. 1995); *Kilpatrick v. Bryant*, 868 S.W.2d 594, 602 (Tenn. 1993); *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 407 (Tex. 1993). Opposition to the loss of chance doctrine is generally based on several policy arguments, including the anomaly and unfairness of applying a lower causation standard to health care providers than other professionals; the risk of increasing the number of successful claims and thereby elevating the price of malpractice insurance and health care costs in general, as doctors are forced to practice "defensive" medicine; and the illusion of deterrence where it cannot be shown that the defendant in fact caused the injury. See, e.g., *Crosby*, 48 F. Supp. 2d at 928-29; *Gooding*, 445 So. 2d at 1019-20; *Fennell*, 580 A.2d at 215; *Kilpatrick*, 868 S.W.2d at 603; *Kramer*, 858 S.W.2d at 406.

¶ 10. Although we have not had occasion to address the issue, a federal district court applying Vermont law has predicted that this Court would adopt the doctrine in a case where the defendant's negligent failure to diagnose reduced the plaintiff's chances of recovery. See *Short v. United States*, 908 F. Supp. 227, 237 (D. Vt. 1995). The federal court's analysis was brief, however, and relied on four decisions in which the loss of chance doctrine was not at issue. In *Lockwood v. Lord*, 163 Vt. 210, 218, 657 A.2d 555, 560 (1994), the defendant claimed that the trial court had improperly instructed on "increased risk of harm" as a separate cause of action. We held that the court had simply used the language as "an awkward way of differentiating multiple proximate causes." *Id.* Thus, the "loss of chance" doctrine was not raised or addressed; indeed, the evidence adduced by the plaintiff there was more than ample to satisfy the traditional proximate cause standard. See *id.* at 216, 657 A.2d at 559.

The other cases cited in *Short, Smyth v. Twin State Improvement Corp.*, 116 Vt. 569, 570-71, 80 A.2d 664, 665 (1951), *Sabia v. State*, 164 Vt. 293, 302-03, 669 A.2d 1187, 1194 (1995), and *Derosia v. Liberty Mut. Ins. Co.*, 155 Vt. 178, 182-83, 583 A.2d 881, 883 (1990), all relied in part on principles consistent with the Restatement (Second) of Torts § 323 (1965), which refers to the duty of care of one whose negligence increases the risk of harm. These decisions did not, however, even remotely consider the loss of chance doctrine as an alternative test of proximate cause.

¶ 11. The requirements for establishing medical malpractice in Vermont are set forth in 12 V.S.A. § 1908, which provides that the plaintiff shall have the burden of proving: (1) "[t]he degree of knowledge or skill possessed or the degree of care ordinarily exercised by" a prudent health care professional in a similar practice under similar circumstances; (2) that the defendant "lacked this degree of knowledge or skill or failed to exercise this degree of care"; and (3) "[t]hat as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred." We have observed that, apart from substituting a national for a community standard of care, the statute essentially codifies "[t]he common law elements of a medical malpractice action." *Senesac v. Assocs. in Obstetrics & Gynecology*, 141 Vt. 310, 313 n.2, 449 A.2d 900, 902 n.2 (1982). Those elements have traditionally included a requirement that the plaintiff adduce evidence of a "reasonable probability or reasonable degree of medical certainty" that the defendant's conduct caused the injury. *Greene v. Bell*, 171 Vt. 280, 285, 762 A.2d 865, 870 (2000) (citing *Everett v. Town of Bristol*, 164 Vt. 638, 639, 674 A.2d 1275, 1277 (1996) (mem.)); see also *Wheeler v. Cent. Vt. Med. Ctr., Inc.*, 155 Vt. 85, 94, 582 A.2d 165, 170 (1989) (preponderance-of-evidence standard governs medical malpractice actions as it does "most issues in civil litigation"); *State v. Bishop*, 128 Vt. 221, 232, 260 A.2d 393, 400 (1969) ("reasonable probability is the standard, rather than conjecture or mere possibility") (Holden, C.J., concurring); *Howley v. Kantor*, 105 Vt. 128, 133, 163 A. 628, 631 (1933) (competent medical testimony required to establish causation to "a reasonable certainty or a reasonable probability").

¶ 12. The loss of chance theory of recovery is thus fundamentally at odds with the settled common law standard, codified in 12 V.S.A. § 1908(3), for establishing a causal link between the plaintiff's injury and the defendant's tortious conduct. Where — as in

Vermont — the plaintiff must prove that as a result of the defendant's conduct the injuries "would not otherwise have been incurred," 12 V.S.A. § 1908(3), an act or omission of the defendant *cannot* be considered a cause of the plaintiff's injury if the injury would probably have occurred without it. This was precisely the state of the record evidence here. Accordingly, the summary judgment in favor of defendant was sound under the law.

¶ 13. Plaintiff urges us nevertheless to depart from the strict statutory requirements, noting that they were codified in 1976, well before "loss of chance" became recognized as a viable theory of recovery. See, e.g., *In re B.L.V.B.*, 160 Vt. 368, 372-75, 628 A.2d 1271, 1273-76 (1993) (construing statute to allow adoption by mother's same-sex partner to conform with changing social mores). We decline to do so. Although some of the arguments in favor of the loss of chance doctrine are appealing, we are mindful that it represents a significant departure from the traditional meaning of causation in tort law. Implicated in such a departure are fundamental questions about its potential impact on not only the cost, but the very practice of medicine in Vermont; about its effect on causation standards applicable to other professions and the principles — if any — which might justify its application to medicine but not other fields such as law, architecture, or accounting; and ultimately about the overall societal costs which may result from awarding damages to an entirely new class of plaintiffs who formerly had no claim under the common law in this state. See, e.g., *Crosby*, 48 F. Supp. 2d at 932 (observing that adoption of loss of chance may be "particularly ill-suited" in small, rural states where physicians "cannot make all potentially beneficial tests and procedures available at anything approaching a reasonable cost"); *Fennell*, 580 A.2d at 215 (noting potential impacts of loss of chance doctrine on medical and insurance costs); Note, *supra*, 59 Mo. L. Rev. at 992-93 (noting difficulty of guessing impact of loss of chance doctrine on medical costs, as well as likelihood of efforts to extend doctrine to other areas of negligence, including legal malpractice); Fischer, *supra*, 36 Wake Forest L. Rev. at 606 (noting potential for "exceedingly broad application" of loss of chance doctrine).

¶ 14. In short, we are persuaded that the decision to expand the definition of causation and thus the potential liability of the medical profession in Vermont "involves significant and far-reaching policy concerns" more properly left to the Legislature, where hearings may be held, data collected, and competing interests heard before a wise decision is reached. *Crosby*, 48 F. Supp. 2d at 931; see also *Fennell*, 580

A.2d at 214 (recognizing that broad policy implications underlie adoption of loss of chance, and thus "[w]e are not convinced that such a change should be initiated by this Court"); *Titchenal v. Dexter*, 166 Vt. 373, 385, 693 A.2d 682, 689 (1997) ("complex social and practical ramifications" of recognizing right of nonparents to seek custody or visitation renders "the Legislature . . . better equipped to deal with the problem"). Accordingly, we hold that the trial court correctly rejected plaintiff's claim for recovery under the loss of chance doctrine, and properly entered judgment for defendant.

*Affirmed.*