Warren KEMPER, M.D.,
Appellant/Cross–
Appellee,

v.

Barry GORDON (Individually and As Surviving Spouse and Personal Representative of The Estate of Lori Gordon, Deceased); Stuart Gordon (By and Through His Parent and Next Friend, Barry D. Gordon); and Samantha Gordon (By and Through her Parent and Next Friend, Barry D. Gordon), Appellees/Cross–Appellants.

Nos. 2005–SC–000306–DG,
2006–SC–000077–DG.

Supreme Court of Kentucky.

June 19, 2008.

Rehearing Denied Jan. 22, 2009.

C. Thomas Hectus, Randall S. Strause, Hectus & Strause PLLC, Louisville, KY, Counsel for Appellant/Cross–Appellee.

Ann B. Oldfather, Brandon M. Howell, Oldfather & Morris, Louisville, KY, Counsel for Appellees/Cross–Appellants.

Opinion of the Court by Justice CUNNINGHAM.

## I. Introduction

This wrongful death case involves the profoundly sad death of a young mother, thirty-eight year old Lori Gordon. Barry Gordon, individually and as surviving spouse and personal representative of the estate of Lori Gordon, deceased; Stuart Gordon, by and through his parent and next friend, Barry D. Gordon; and Samantha Gordon, by and through her parent and next friend, Barry D. Gordon, (collectively referred to as the Gordons) allege that Lori's death was the result of a negligent misdiagnosis by, among others, Dr. Warren Kemper. Various claims filed by the Gordons were resolved, both before trial and up through the return of the jury verdict. As a result, the jury's finding of no negligence on the part of Lori's healthcare providers had an impact only on Dr. Kemper. In resolving cross-appeals, the

Court of Appeals affirmed in part, reversed and remanded in part.

By granting discretionary review, this Court is being called upon to address the decision of the Court of Appeals adopting the "lost or diminished chance" doctrine of recovery—a new direction in Kentucky law. In their cross-appeal, the Gordons argue separate grounds for reversal and a new trial. Further, in the event a new trial is granted, the Gordons ask this Court to review numerous evidentiary issues.

While we reject the adoption of the "lost or diminished chance" doctrine of recovery, we conclude the Gordons have established sufficient grounds for a new trial.

## II. Factual Background

In early February 1996, Lori, then thirty-eight years of age and otherwise in good health, suddenly experienced chest pain, shortness of breath, severe nausea, and dizziness. She was admitted to Baptist Hospital East for a cardiovascular evaluation which was conducted by Dr. George Stacy. When Lori's tests all appeared within normal limits, Dr. Stacy ruled out any cardiovascular cause and discharged Lori with directions to follow-up with her primary care physician if her symptoms reoccurred.

On April 14th, while seeing a movie with one of her children, Lori again experienced chest pain and nausea. She was transported by ambulance to Baptist Hospital East and examined by Dr. Charles Smith in the emergency room. Finding no medical cause for Lori's symptoms, Dr. Smith prescribed Ativan for anxiety and recommended she see an internist.

The next day, April 15th, Lori visited the office of Dr. Warren Kemper. Dr. Kemper ordered an ultrasound of her gall-bladder. When the results of this test came back within normal limits, Dr. Kemper prescribed Xanax for anxiety. When Lori later phoned to inform him of her continued nausea, Dr. Kemper ordered a Computed Axial Tomography (CAT) scan of her abdomen. When the results of the CAT scan proved to be within normal limits, Dr. Kemper believed he had ruled out all possible physical causes for Lori's symptoms and reached the opinion that Lori suffered from anxiety and/or panic attacks. Dr. Kemper provided Lori with the names of several psychiatrists.

Acting on Dr. Kemper's recommendation, Lori saw Dr. Lawrence Mudd, a psychiatrist, in June and July. Dr. Mudd also diagnosed Lori with anxiety disorder and began treating her with medications. In late August of 1996, as Lori's nausea and chest pain continued, she sought out the care of a new internist, Dr. Robert Ellis. Dr. Ellis, also unable to identify a medical explanation for Lori's symptoms, continued to treat her for anxiety. Lori then turned to psychologist, Dr. Carol Massey, in September, and a new psychiatrist, Dr. Karen Head, in October. In December, Lori came under the care of yet another psychiatrist, Dr. Kenneth Davis. Throughout this time, each of Lori's healthcare providers continued to treat her for anxiety and/or panic attacks.

Lori's symptoms persisted, and on December 11, 1996, she was again taken to the emergency room at Baptist Hospital East complaining of chest pain. Lori was seen in the emergency room by Dr. Theodore Ivanchek. When a medical cause for her symptoms could not be determined, Lori was released. On December 21, 1996, Lori again went to the emergency room. On this occasion, she was examined by Dr. Jim Sharp. Once Dr. Sharp ruled out any possible cardiac causes, he released Lori with the recommendation that she follow-up with her primary care physician.

Lori saw Dr. Ellis on December 27, 1996. In addition to her symptoms of nausea and chest pain, Lori described coughing up blood, discomfort in the region of her left chest, and weight loss (by this time she was down to 117 pounds). Once again, Lori underwent a cardiac evaluation by Dr. Stacy.

In January of 1997, Dr. Ellis confirmed Lori had an enlarged lymph node and an unidentified mass on her neck. Dr. Ellis referred Lori to a surgeon, Dr. Chipman, who performed a biopsy. On February 3, 1997, Dr. Chipman informed Lori that both masses contained carcinoma, and the next day she was admitted to Alliant Hospital under the care of Dr. Don Stevens. A CAT scan of her abdomen and pelvis revealed extensive adenopathy. The diagnosis at that time was metastasized gastric (stomach) cancer.

Sadly, on January 13, 1998, Lori died as a result of complications from gastric cancer. Prior to her death, she had filed claims against Dr. Kemper and others. However, at the time of trial, all of her claims had been resolved with the exception of those against Drs. Kemper, Ellis, and Mudd. After the case was submitted to the jury, but before the verdict was returned, the Gordons reached settlements with Drs. Ellis and Mudd. The jury was not informed of the settlements and eventually returned a verdict in favor of all three medical providers. On April 3, 2002, the circuit court entered judgment pursuant to the jury verdict and dismissed all claims against Dr. Kemper.

## III.  Analysis

### A.  The lost or diminished chance doctrine

We first address the lost or diminished chance doctrine adopted by the Court of Appeals as a basis for its reversal. In challenging the Court of Appeals' decision, Dr. Kemper points out that this doctrine has never been adopted by Kentucky courts. Further, he argues it is neither a natural extension of current Kentucky law, nor should it be adopted as a matter of public policy.

At the trial, the jury was required to make the traditional finding in malpractice cases. The instruction, in pertinent part, asked:

> Do you believe from the evidence that Dr. Kemper failed to use the degree of care imposed upon him by this Instruction, and that such failure was a substantial factor in causing the injury to Lori Gordon about which you have heard evidence?

The instructions requested by the Gordons are at the heart of the lost or diminished chance issue. First, the Gordons requested that the jury make a finding as to whether the breach of the doctor's duty was a substantial factor "in causing Lori to lose a measurable chance of surviving her cancer[.]" Alternatively, the Gordons asked that the jury decide whether the breach of the doctor's duty was a substantial factor "in delaying Lori Gordon's diagnosis and treatment[.]" The Gordons' proposed instructions, which were rejected by the trial court, essentially allowed the jury to compensate Lori for her lost or diminished chance of survival due to the late diagnosis.

A significant difference exists between the two concepts. When applying the all or nothing principle—as was done in this case—the jury is required first to find that the doctor deviated from the standard of care appropriate for the case, and then find that such failure was a substantial factor in causing injury. Here, the injury was the death of Lori Gordon. Thus, under the all or nothing approach, the Gordons would have been required to prove

within a reasonable probability that Lori would have recovered or survived absent the doctor's negligent conduct. Under the lost or diminished chance doctrine, the Gordons would not have been required to prove that the misdiagnosis was, in fact, a substantial factor in causing Lori's death. Rather, the Gordons would have only been required to show that it diminished Lori's chance for recovery or survival.

In other words, under the all or nothing rule, the compensable injury in this case would be Lori's death resulting from the cancer. Under the lost or diminished chance doctrine, however, the compensable injury would be Lori's lost opportunity of recovery or survival from the cancer. The difference in these two doctrines is drastic. Under the traditional all or nothing rule, the Gordons would only recover if they could show within a reasonable probability that Dr. Kemper's failure to diagnose Lori's stomach cancer caused her death. Here, the jury found that it did not. Had the jury been given a lost or diminished chance instruction, however, the Gordons could have recovered on a proportional basis for any lost or diminished chance of survival found by the jury.

If the jury had been allowed to find within a reasonable probability that had Lori's cancer been diagnosed on her first visit to Dr. Kemper her chance of recovery would have been 30%, but that at the actual time her cancer was finally discovered her chance of recovery had become only 5%, the Gordons would then have been entitled to recover 25% of the total damages resulting from Lori's death. Needless to say, wrongful death damages in

cases like the one of Lori Gordon are usually quite substantial. Therefore, even a small percentage of damages can also be quite substantial.

At this writing, a growing number of states have adopted the lost or diminished chance doctrine in malpractice lawsuits.[1] The Court of Appeals, in adopting this new tort concept, relies on this Court's decision in *Davis v. Graviss*, 672 S.W.2d 928 (Ky. 1984).[2] It interprets that case as recognizing the right to recovery for an "increased risk of future harm" and laying the groundwork for a natural progression into accepting the lost or diminished chance method of recovery. Thus, the Court of Appeals concluded, "As the Supreme Court has already signaled its intent to permit recovery for an increased risk of future harm, we believe it would, likewise, be inclined to permit recovery for a lost chance of recovery/survival." *See Gordon v. Kemper*, No. 2002–CA–001983–MR at 13, 2005 WL 678535 (Ky.App. March 25, 2005).

We find that the Court of Appeals has incorrectly interpreted the *Davis* case. In that case, the jury was allowed to consider the probability of future medical problems as it related to damages-not liability—for future mental suffering. In *Davis*, the plaintiff was the victim of a car accident that caused a permanent defect in the base of her skull, resulting in periodic leakage of cerebral fluid. Physicians presented her with two dreadful options. She could elect not to have surgery, but confront the possibility that future leakage of cerebral fluid would occur with devastating results; or she could have surgery with the possi-

---

1. They include the neighboring states of Illinois, Indiana and Missouri. However, other neighboring and nearby states such as Tennessee and South Carolina have refused to recognize this theory.

2. *Davis* was overruled on other grounds by *Sand Hill Energy, Inc. v. Ford Motor Co.*, 83 S.W.3d 483, 493–95 (Ky.2002). *Sand Hill* was subsequently vacated by *Ford Motor Co. v. Smith*, 538 U.S. 1028, 123 S.Ct. 2072, 155 L.Ed.2d 1056 (2003).

bility of terrifying results—even death. Psychiatric evidence established that this mental anguish was a probability, not a mere chance.

This Court upheld the jury's award in favor of the plaintiff, concluding that an award for damages based on the plaintiff's fear was not speculative. As Justice Leibson succinctly stated, "Thus the threshold question is the appellant's right to compensation for an injury causing an increased risk of future harm and for mental suffering and impairment of earning power resulting from the *fear* caused by the risk of future harm." *Davis*, 672 S.W.2d at 930. Such a holding does not serve as a precursor for this Court to accept the legal doctrine of lost or diminished chance. In *Davis*, future periodic brain leakage was a possibility, but the mental anguish was a probability resulting directly from her injuries and, therefore, compensable. Also, and perhaps most importantly, in *Davis* this Court was dealing with damages. Here, we are asked to extend its reasoning to liability.

Both sides also refer to *Walden v. Jones*, 439 S.W.2d 571 (Ky.1969). Contrary to the suggestion of the Gordons, we find no support in that case for the lost or diminished chance doctrine. In fact, it seems clearly to be a rejection by this Court of that principle.

In *Walden*, the plaintiff alleged his paralysis was the result of a misdiagnosis that was later discovered. However, medical testimony at trial established that the plaintiff *might* have had a chance of recovery had he been properly diagnosed originally, but that he probably would not have recovered even absent the alleged negligence. Finding insufficient evidence to raise a jury issue of proximate causation, the trial court directed a verdict in favor of the defendants. This Court affirmed, stating that it did not accept the "argument that any chance of recovery, no matter how remote, entitles the plaintiff in a malpractice suit to have the issue of proximate cause submitted to the jury." *Walden*, 439 S.W.2d at 575.

In the case of *Richard v. Adair Hosp. Found. Corp.*, 566 S.W.2d 791 (Ky.App. 1978), however, the medical testimony linking the alleged negligence to the lost chance of recovery was much stronger than in *Walden*. In *Richard*, an infant suffering from pneumonia was twice turned away from the emergency room based on the negligent determination that no emergency existed. The child later died as a result of the pneumonia. The medical testimony at trial established that the infant's chances of recovery would have been substantially greater had she been treated during one of the first two visits to the emergency room.

The Court of Appeals determined that summary judgment in favor of the defendant was prematurely granted. At first blush, the *Richard* opinion seems to allow compensation for the infant's lost chance of survival, based on the testimony that she might have lived if properly diagnosed. However, a careful reading reveals that damages could be awarded only if the jury determined that the hospital's negligence caused the infant's death: "We feel that the proper disposition of this case is dependent upon the determination of whether appellee was negligent in twice refusing hospital admission to the infant, based upon the child's condition when admission was requested, when an unmistakable emergency situation may have existed." *Richard*, 566 S.W.2d at 793. The *Richard* opinion is silent as to whether the infant's estate could be compensated for the lost chance of survival itself, as the Gordons request in this case.

We are fully appreciative of the Gordons' point that the standard of proof in

the lost or diminished chance doctrine would still be anchored in the requirement of probabilities. It is argued that a plaintiff would still be required to show, within a reasonable probability, that the negligence caused the loss of the chance of survival. However, a close look at the semantics of this argument makes it clear that this amounts to a concept chasing its own tail. When the dew leaves the rose, it is still a rose. The reasonable probability of a chance of survival is still just a possibility.

We further take issue with the Court of Appeals' determination that public policy reasons support the recognition of lost or diminished chance of recovery as a distinct and compensable injury in tort law. Even as we write this opinion, our society is wallowing near the water line with the burdensome and astronomical economic costs of universal healthcare and medical services. Rising malpractice insurance premiums for physicians are undoubtedly a part of that financial burden. Medical science and technology are advancing at a dizzying and sometimes seemingly miraculous rate. Our expectations as recipients of these modern day blessings ride upon the tail of this comet. We must acknowledge, however, that in spite of seemingly miraculous cures and mind-boggling technology that allow us to both examine and evaluate the human body, the diagnosis must still be seen by human eyes, analyzed by human minds, and treatment offered by human hands. That is why there remains great wisdom in ensuring that our laws offer redress for those wronged by medical malpractice based on reasonable probabilities and substantial cause, not on chance or mere possibility. Perfection is not part of human nature, and rarely does wisdom say one thing and nature another—wings for angels and feet for men.

We are troubled by the potential financial burden that might be spread upon the shoulders of millions of people if we adopt this new concept of lost or diminished chance of recovery. Further, we see many difficulties in adopting the lost or diminished chance doctrine. For instance, what is a "late diagnosis"? Does a diagnosis missed this week, but made next week, rise to the level of diminished chance? A whole new and expensive industry of experts could conceivably be marched through our courts, providing evidence for juries that an MRI misread on Monday, but accurately discerned on Friday, perhaps gives rise to an infinitesimal loss of a chance to recover. Yet, under this doctrine, even a small percentage of the value of a human life could generate substantial recovery and place burdensome costs on healthcare providers. This additional financial load would be passed along to every man, woman, and child in this Commonwealth.

We find it difficult to improve upon the words of the Vermont court which, in rejecting the principle of lost or diminished chance, stated:

> Although some of the arguments in favor of the loss of chance doctrine are appealing, we are mindful that it represents a significant departure from the traditional meaning of causation in tort law.... [T]he decision to expand the definition of causation and thus the potential liability of the medical profession in Vermont "involves significant and far-reaching policy concerns" more properly left to the Legislature, where hearings may be held, data collected, and competing interests heard before a wise decision is reached. (Internal citations omitted.)

See *Smith v. Parrott*, 175 Vt. 375, 833 A.2d 843, 848 (2003). In short, this Court declines to expand tort liability by judicial legislation in a matter of such far reaching

consequence to our citizens. Therefore, we reverse that portion of the decision of the Court of Appeals adopting the doctrine of lost or diminished chance for tort recovery in medical malpractice cases.

Having thus resolved the issue of the lost or diminished chance doctrine, we need not reach the merits of Dr. Kemper's argument that the adoption of the doctrine would violate § 241 of the Kentucky Constitution.

### B. Alternative arguments for reversal and new trial

Through a protective cross-appeal, the Gordons raise additional grounds for reversal of the circuit court. First, the Gordons argue they were entitled to a peremptory instruction on whether Dr. Kemper violated the standard of care. Second, they argue the circuit court erred in excluding key evidence.

The Court of Appeals, having reversed on the lost or diminished chance doctrine, found the Gordons' remaining arguments to be without merit. While we agree the Gordons' argument concerning a peremptory instruction is without merit, we disagree with the Court of Appeals as to the exclusion of certain evidence, and thus, we reverse the Court of Appeals' decision which affirmed the circuit court in this regard and conclude the Gordons are entitled to a new trial.

**1. The circuit court did not err in denying the Gordons a peremptory instruction on whether Dr. Kemper violated the standard of care.**

■ The Gordons argue they were entitled to a peremptory instruction on Dr. Kemper's breach of the standard of care. To support their argument, the Gordons point out that Dr. Kemper believed he had ruled out all possible physical causes for Lori's symptoms once the ultrasound of her gallbladder and the CAT scan of her abdomen came back within normal limits. Further, the Gordons point to the testimony of one of Dr. Kemper's own experts, Dr. Ehrie, which they claim acknowledged that the failure to conduct further tests was a breach of the standard of care, and that all physical causes for Lori's symptoms could not be ruled out based only on the two tests Dr. Kemper ordered. Relying on this evidence, the Gordons claim they were entitled to a directed verdict on the issue of breach of the standard of care.

In reviewing the denial of a motion for a directed verdict, this Court has stated:

> [a]ll evidence which favors the prevailing party must be taken as true and the reviewing court is not at liberty to determine credibility or the weight which should be given to the evidence, these being functions reserved to the trier of fact. The prevailing party is entitled to all reasonable inferences which may be drawn from the evidence. (Citations omitted.)

*USAA Cas. Ins. Co. v. Kramer,* 987 S.W.2d 779, 781 (Ky.1999). Further, "[w]here there is conflicting evidence, it is the responsibility of the jury to determine and resolve such conflicts[.]" *Bierman v. Klapheke,* 967 S.W.2d 16, 19 (Ky.1998). "Generally, a trial judge cannot enter a directed verdict unless there is a complete absence of proof on a material issue or if no disputed issues of fact exist upon which reasonable minds could differ." *Id.* at 18–19.

While the Gordons have pointed to evidence which would support their position, this does not resolve the issue. Dr. Kemper has pointed out that Dr. Ehrie testified the standard of care would not have required an upper gastrointestinal (GI) workup at the time Lori appeared in Dr. Kemper's office on April 15th. Further, Dr. Ehrie testified that ordering no fur-

ther tests and allowing time to see if the medication addressed Lori's symptoms was not a deviation from the standard of care.

Although it appears as if Dr. Ehrie gave conflicting testimony, this is not sufficient to warrant a directed verdict. The jury, responsible for resolving such conflicts, ruled in favor of Dr. Kemper. Under these circumstances, the circuit court did not err in denying the Gordons' motion for a directed verdict on breach of the standard of care, nor were the Gordons entitled to a peremptory instruction on this issue.

**2. The circuit court did not err in excluding certain testimony offered through Drs. Ehrie and Rubin.**

■ The Gordons argue the circuit court committed reversible error in excluding certain testimony offered by Drs. Ehrie and Rubin. They point out that Dr. Ehrie would have testified Lori was in the early stages of her disease when she saw Dr. Kemper. Further, Dr. Ehrie was of the opinion that had Lori returned to Dr. Kemper's office and been properly diagnosed, she would have survived. The circuit court concluded that since Dr. Ehrie was not a board certified oncologist, he did not qualify as an expert for the purpose of giving an opinion as to the likelihood of Lori's survival. Citing to *Owensboro Mercy Health Sys. v. Payne*, 24 S.W.3d 675, 677 (Ky.App.2000), the Gordons argue any lack of specialized training goes to weight, not admissibility. Further, they argue it is actual experience, skill, and knowledge which should be considered for admissibility, not the designation of a particular specialty. *See Collins v. Commonwealth*, 951 S.W.2d 569, 575 (Ky.1997). Thus, since Dr. Ehrie, as an internist, diagnoses and treats cancer patients in his practice, the Gordons claim it was reversible error to exclude his testimony.

The Gordons seem to have over simplified the purpose of Dr. Ehrie's testimony. While he may have been qualified to determine if Lori's cancer should have been diagnosed sooner, and whether she would have been a candidate for treatment, this does not mean he was qualified to testify whether Lori would have survived. The decision to qualify a witness as an expert rests in the sound discretion of the trial court. *See Payne*, 24 S.W.3d at 677. Further, it is not qualification in the abstract, but whether the witness's qualifications provide the necessary foundation to respond to the specific question asked. *See Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir.1994). Given Dr. Ehrie's education and experience, and the specific question asked, we cannot say the Gordons have demonstrated a clear abuse of discretion in excluding this evidence.

■ Likewise, we find no abuse of discretion in the circuit court's decision to exclude a portion of the testimony of one of the Gordons' experts, Dr. Rubin. Dr. Rubin would have testified Lori's cancer could have been treated through January of 1997. Dr. Rubin based her opinion on radiological studies which showed no abnormalities in the abdomen prior to that time. Based on these studies, Dr. Rubin concluded the tumor had not broken through the stomach wall and, thus, could have been treated.

Dr. Kemper objected, claiming the Gordons failed to disclose this opinion as required under Kentucky Rule of Civil Procedure (CR) 26.02. Unable to cite the court to specific disclosure, the Gordons argued they substantially complied by disclosing Dr. Rubin's general opinion that Lori's disease could have been treated. The circuit court concluded generalities were not sufficient and sustained the objection. This decision is in accord with the

disclosure requirements set out in CR 26.02 and CR 26.05. As the Gordons failed to supplement prior expert disclosure, the circuit court acted within its discretion in excluding the evidence. *See Welsh v. Galen of Virginia, Inc.,* 128 S.W.3d 41, 48–9 (Ky.App.2001).

**3. The circuit court committed reversible error when, having found the matter to be collateral, it precluded the Gordons from questioning Dr. John on apparently inconsistent testimony he had given in a previous case.**

■ The Gordons argue the circuit court erred by precluding them from questioning one of Dr. Kemper's experts, Dr. William John, concerning expert testimony he had given in a prior case. The Gordons suggest that in that case Dr. John testified a patient suffering from gastric cancer could have been treated six months prior to death. Yet, when testifying in this case, Dr. John concluded Lori's last chance of cure was seventeen months prior to being diagnosed with Stage IV gastric cancer. In sustaining the objection, the circuit court concluded the line of questioning was collateral.

In asking us to affirm the circuit court's decision, Dr. Kemper treats it as a prior inconsistent statement. Citing to *Eldred v. Commonwealth,* Dr. Kemper suggests the Gordons are attempting to improperly impeach Dr. John on a collateral matter. 906 S.W.2d 694, 705 (Ky.1994), *overruled on other grounds by Commonwealth v. Barroso,* 122 S.W.3d 554 (Ky.2003). We disagree.

This Court has held that a party is entitled to cross-examine an expert on any subject that reflects on the expert's credibility. *See Tuttle v. Perry,* 82 S.W.3d 920, 923–24 (Ky.2002). Further, we have rejected the claim that the credibility of an expert is collateral. *See Miller v. Marymount Med. Ctr.,* 125 S.W.3d 274, 281–82

(Ky.2004). After all, the credibility of a witness's relevant testimony is always at issue. *See Sanborn v. Commonwealth,* 754 S.W.2d 534, 545 (Ky.1988), *overruled on other grounds by Hudson v. Commonwealth,* 202 S.W.3d 17 (Ky.2006).

Alternatively, Dr. Kemper argues the testimony was properly excluded under KRE 403. Dr. Kemper notes that, in the avowal, Dr. John explained the differences in his opinions based on the different medical histories of each patient. Further, Dr. Kemper points out that Dr. John testified it would take several hours for him to explain the differences in the patient histories to the jury. Under these circumstances, Dr. Kemper argues this line of questioning would cause undue delay and confusion. We disagree.

The Gordons had the right to impeach Dr. Kemper's expert by showing both bias and inconsistent statements. On its face, the expert's opinion in a previous case that gastric cancer could have been treated successfully six months before a Stage IV diagnosis, versus his opinion in this case that Lori's cancer could not have been successfully treated seventeen months prior to her Stage IV diagnosis, are seemingly inconsistent. Also, to put it in its worst light, the jury could conclude that the expert was paid to say one thing in one case and paid to say something else here. Under the case law, the Gordons were entitled to have the jury consider this information for the purpose of impeachment. The extent to which the opinion in that prior case could be explored would then be in the discretion of the trial judge. The trial judge would have broad discretion in determining how much explanation of the previous case would be allowed. It is not beyond the pale of common sense for juries to understand that each human being is unique, and that the diagnoses and prog-

noses of two different people suffering from the same disease may vary greatly. Physical condition, quality of previous health care, and a myriad of other factors come into the mix. It does not create confusion, nor expend a great deal of time, to remind the jurors of this. But because of the trial court's ruling, the jury never got that chance. In considering the avowal, it seems to us that the trial court threw the baby out with the bath water.

Thus, contrary to the conclusion reached by the Court of Appeals, we find the circuit court erred in excluding the evidence as collateral. For this reason, we conclude the Gordons are entitled to a new trial.

## C. Additional Evidentiary Issues

Having concluded the Gordons are entitled to a new trial, we turn our attention to the numerous evidentiary issues raised by the Gordons on appeal. We will address them to the extent we believe they will arise on retrial.

The first issue raised by the Gordons concerns the testimony of Dr. Thurman. Dr. Thurman, an expert witness retained on behalf of Dr. Ellis, found fault with Dr. Kemper's care of Lori. It was Dr. Thurman's opinion that Dr. Kemper erred in not ruling out all possible physical causes for Lori's symptoms, and in not developing a plan for further steps following the ultrasound of her gallbladder and the CAT scan of her abdomen. In particular, Dr. Thurman believed Dr. Kemper should have ordered an upper GI workup.

This testimony was admitted over Dr. Kemper's objection. The circuit court concluded the testimony was admissible under CR 32.01, which states in part that "[i]f only part of a deposition is offered in evidence by a party, an adverse party may require him to introduce any other part[.]" As Dr. Ellis has settled and will not be a party in the event of retrial, the Gordons argue Dr. Thurman's testimony is admissible under *Miller v. Marymount Med. Ctr.*, 125 S.W.3d at 274. In that case, this Court held that where a plaintiff retains an expert who would have testified against a defendant who subsequently settles, the testimony may be introduced by the remaining defendant. *Id.* at 284.

The Gordons' argument ignores the basis for Dr. Kemper's challenge to this testimony. Early in the action, Dr. Kemper's attorney consulted with Dr. Thurman concerning the claims against Dr. Kemper. Dr. Thurman allegedly reviewed the records, gave a report, and was subsequently not used by Dr. Kemper as an expert. Citing *Newsome v. Lowe*, 699 S.W.2d 748, 752 (Ky.App.1985), Dr. Kemper argues his consultation involved attorney work product and created a claim of privilege. In considering this argument, we note our recent decision in *Sowders v. Lewis*, 241 S.W.3d 319 (Ky.2007), would seem to support Dr. Kemper's position. However, there remains a question as to whether the privilege was waived, and if so, to what extent once Dr. Kemper allowed Dr. Thurman to serve as an expert on behalf of Dr. Ellis. This we leave for the trial court to address.

The Gordons have also argued Dr. Kemper should not be allowed to seek apportionment among the settling healthcare providers. In support of their argument, the Gordons point out that Dr. Kemper presented no direct evidence to show any of the other providers were at fault. We disagree. Under Kentucky Revised Statute (KRS) 411.320, the circuit court is required to instruct the jury regarding apportionment of fault among all parties to the action, as well as persons who have settled and are not parties. *See also Owens Corning Fiberglas Corp. v. Parrish*, 58 S.W.3d 467, 481 (Ky.2001). In seeking such an instruction, Dr. Kemper may rely

on any evidence introduced into the record. This includes evidence introduced by the Gordons or developed through cross-examination. Further, we reject the Gordons' claim that the jury verdict alters the results for Drs. Ellis and Mudd. Regardless of the verdict, both are settling parties.

Next, the Gordons argued they should have been able to introduce Lori's diary, a "To Do List" she left for her husband, and statements she made to a friend about her illness and care. The circuit court excluded this evidence as inadmissible hearsay. As we consider this argument, we are mindful that the admissibility of evidence lies within the sound discretion of the trial judge. *See Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 577–78 (Ky. 2000). Further, the burden lies with the Gordons, as proponents of the evidence, to demonstrate its admissibility. If they are able to do so, the trial judge must then determine if undue prejudice exists and outweighs the probative value under KRE 403. This we leave for the trial court to consider in the event of retrial.

We turn next to the admissibility of literature on the loss of a parent. We begin by noting that the Gordons are not asking if their expert can rely and cite to the literature. Rather, they are claiming they should be allowed to introduce the material for the jury to read and consider on its own. Once again, we note that the burden of establishing the necessary foundation and proving the admissibility rests on the Gordons, the proponents of the evidence. The Gordons have failed to cite to any authority, nor have we found any, which would allow them to introduce such material for the jury to read and consider on its own.

The Gordons also argue the jury should not be instructed to disregard their feelings of sympathy. In considering this argument, we note that the record reflects that the circuit court did not instruct the jury on this. Rather, Dr. Kemper's attorney, in closing argument, asked the jury to set their sympathies aside. As we have previously held no effort should be made to enlist the sympathy of the jury, we can find no error in counsel's argument. *See Southern–Harlan Coal Co. v. Gallaier*, 240 Ky. 106, 41 S.W.2d 661, 663 (1931). Further, as we are mindful that matters pertaining to closing argument lie within the sound discretion of the trial judge, we leave this issue in the trial court's hands to exercise that discretion. *See Hawkins v. Rosenbloom*, 17 S.W.3d 116, 120 (Ky.App. 1999).

Finally, we note the Gordons have asked this Court to find that portion of Dr. Shields' testimony regarding the necessity of a upper GI workup be held inadmissible. This we will not do. During his deposition, the Gordons' attorney asked Dr. Shields a hypothetical question concerning whether, under the circumstances present when Dr. Kemper saw Lori on April 15th, an upper GI workup should have been ordered. Dr. Shields replied that an upper GI should not have been ordered under those conditions. As set out above, we will leave it in the trial judge's hands to determine if the burden of establishing foundation and admissibility is met in the event of retrial.

## IV. Conclusion

After considering the arguments, we reverse the decision of the Court of Appeals adopting the lost or diminished chance doctrine. Further, we find the Court of Appeals erred in affirming the decision of the trial court to exclude, as collateral, evidence that Dr. John had given apparently contrary testimony as an expert in another case. Under these circumstances, we conclude the Gordons are entitled to a

new trial, though on grounds different from those relied on by the Court of Appeals.

SCOTT, J., and JAMES D. HARRIS, JR., Special Justice, concur. LAMBERT, C.J., concurs in result only by separate opinion in which ABRAMSON, J., joins. NOBLE, J., dissents by separate opinion in which THOMAS C. SMITH, Special Justice, joins. MINTON and SCHRODER, JJ., not sitting.

Opinion by Chief Justice LAMBERT Concurring in result only.

I concur with the result of the majority opinion. Though artfully written, I believe the majority has strayed from its role with speculation about economic, technological, and social circumstances. Moreover, I believe the majority has too greatly circumscribed the role of this Court in the development of tort law. I reject the view in *Smith v. Parrott*[1] that changes in tort law are exclusively for the legislature.

With those criticisms noted, the majority is correct in declining to create a new lost or diminished chance doctrine. In meritorious cases, the instruction given in this case is broad enough to permit a finding of liability. Here, the jury found no liability, undoubtedly because of Lori's hopeless diagnosis.

ABRAMSON, J., joins this opinion concurring in result only.

Dissenting Opinion by Justice NOBLE.

Respectfully, I dissent.

Since the early 1980s, Professor Joseph H. King, Jr., has propounded the alternate theory of recovery in appropriate tort cases known as the loss-of-a-chance theory, or simply lost chance, but in a simplified form from the complicated legal debate then occurring about causation questions. *See* Joseph H. King, Jr., *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences*, 90 Yale L.J. 1351 (1981); Joseph H. King, Jr., *"Reduction of Likelihood" Reformulation and Other Retrofitting of the Loss-of-a-Chance Doctrine*, 28 U. Mem. L.Rev. 492 (1998) [hereinafter King, *"Reduction of Likelihood"*]. The doctrine has most frequently been argued in medical malpractice cases where there has been a failure to diagnose a condition through either a complete failure or a misdiagnosis. The claimant argues that the physician's negligence resulted in a lost chance or opportunity for a better result. Opponents of the theory argue that it is impossible to definitively say that a claimant would even have had a better chance absent the tortfeasor's negligence. Given that most of medical negligence causation is proved by the testimony of experts, the opponents' arguments seem specious.

In fact, the most common scenarios are similar to the facts of this case. A patient's illness or condition is not diagnosed in time for the patient to receive treatment that has a chance of ameliorating or avoiding the end result of the untreated illness or condition. The medical proof is that at the point of failure to diagnose, the patient had a better chance of the best result from treatment. Obviously, this type of proof falls within the realm of expert testimony. Nonetheless, the patient has had a very real loss of a valuable opportunity that is easily understood at the human level. What patient would not feel he or she had been harmed by a physician's negligent failure to diagnose when they are told that they had a chance for a better recovery at that point in time which was lost due to

1. 175 Vt. 375, 833 A.2d 843, 848 (2003).

the negligence? How could a patient help but blame the physician for taking away that chance through his negligence?

"[W]hen a defendant tortiously destroys or reduces a victim's prospects for achieving a more favorable outcome, the plaintiff should be compensated for that lost prospect. Damages should be based on the extent to which the defendant's tortious conduct reduced the plaintiff's likelihood of receiving a better outcome." King, "*Reduction of Likelihood*," 28 U. Mem. L. Rev at 492 (footnotes omitted). This should hold true whether the likelihood of avoiding or ameliorating injury is better than even or not.

Part of what makes courts wary of the lost chance doctrine is the unnecessary complication created by assuming that lost chance only applies if there is a 50% chance or less that a better outcome was lost due to the failure to diagnose. This is the wrong approach. The cause of action cannot intelligently be divided by looking at causation on a continuum where the jury finds the negligence of the physician to be a substantial factor, 51% or better, in causing the patient's injury, but then tacking lost chance of a better recovery into that analysis by saying that anything 50% or less should be compensable because of the lost chance. This is mixing apples and oranges.

While I don't completely agree with Professor Hill's view of lost chance valuation, his view that the lost chance for a better recovery should be compensable makes sense if one considers that the lost chance doctrine is actually an alternative theory of injury when compared to the standard view of failure to diagnose causing a physical result in the patient. Under lost chance, the patient is not claiming he was injured by the physical result, but rather the injury is the loss of opportunity for a better result. In either case, the tortious conduct is the negligent failure to diagnose, but what that failure causes is different. For example, negligent failure to diagnose an ongoing heart attack could be reasonably viewed as a substantial factor in causing the patient's death. However, if the jury found that it was not a substantial factor in causing the death because the severity of the heart attack he had would inevitably result in death, it still could be a substantial factor in reducing the patient's chance for a better result if it had been diagnosed and treated before it became that severe. Proof could indicate that with early diagnosis, the patient would have had a percentage of chance for a better result somewhere between 1 to 100%. This lost chance is a valuable opportunity, the value of which is greater as the likelihood of a better result increases.

Perhaps the best way to view this alternative theory is to look at the instructions which should be given to the jury. The first instruction would describe the general duty of the physician to act within the proper standard of care, followed by an interrogatory as to whether he did so:

Instruction # 1

It was the duty of the defendant, Doctor X, to exercise the degree of care and skill of a reasonably competent physician acting under the same or similar circumstances in diagnosing the Plaintiff's (decedent's) condition which resulted in her injury (death).

Interrogatory # 1

Do you believe, based on the evidence, that Dr. X failed to act with the degree of skill and care of a reasonably competent physician under the same or similar circumstances when he failed to diagnose the condition of the Plaintiff (decedent)?

Yes＿＿＿＿＿ No＿＿＿＿＿

If the jury finds that the physician did not violate his duty of care, then the inquiry is over.

However, if the jury finds that the physician has violated his duty of care, then the stage is set for alternative theories of injury. First, inquiry should be made as to whether the failure to diagnose was a substantial factor in causing the patient's physical injury:

Interrogatory # 2

Do you believe, based on the evidence, that Dr. X's failure to diagnose the Plaintiff's (decedent's) condition was a substantial factor in causing her injury (death)?

Yes_____ No_____

If the jury answers yes to this query, then under present causation analysis, the all or nothing approach, the doctor is liable for the injury or death and the jury will assess compensation under the standard damage instruction. If the jury answers no, then it should proceed to a lost chance causation interrogatory:

Interrogatory # 3

If you did not find for the Plaintiff (decedent's estate) under Interrogatory # 2, do you believe, based on the evidence, that Dr. X's failure to diagnose the Plaintiff (decedent) was a substantial factor in reducing the Plaintiff's (decedent's) chance of a better result?

Yes_____ No_____

At this point, if the jury answers no, then they have found for the physician on both injury theories, and the case is concluded. If the jury answers in the affirmative, then they should be asked to evaluate the degree or percentage of lost chance and determine damages. Lost opportunity for a better result can be any percentage between one and one hundred. This encompasses a total loss of chance down through any lesser degree of opportunity

lost. This is the most difficult part of this theory, because many factors can influence the percent of chance for a better result available to any given patient. However, this is not an impossible task, and can be based on scientific knowledge and the experience of an expert witness. It is the expert who will do the math, and present a statement of percentage of lost chance for a better result to the jury, subject to cross-examination, but the jury will determine the compensable percentage:

Interrogatory # 4

What percentage for the loss of a chance do you attribute to Dr. X's failure to diagnose the Plaintiff's (decedent's) condition?

_____%

The jury should then be asked to place a value on that lost chance for a better result, through a separate damage instruction:

Instruction # 2

You have found that the defendant, Dr. X, did not act with the degree of care and skill of a reasonably competent physician under the same or similar circumstances in failing to diagnose the Plaintiff's (decedent's) condition and that failure to diagnose was a substantial factor in reducing the Plaintiff's (decedent's) chance of a better result. You must now determine what amount of money, if any, would reasonably compensate the Plaintiff (decedent's estate) for her percentage of loss of a chance for a better result, which you found in Interrogatory # 4, considering that you have found that the defendant, Dr. X's, failure to diagnose the Plaintiff's (decedent's) condition did not cause the Plaintiff's (decedent's) injury (death).

Interrogatory # 5

What amount of money would reasonably compensate the Plaintiff (dece-

dent's estate) for her percentage of loss of a chance for a better result?

| | |
|---|---|
| Mental and physical suffering, (including any such as she is reasonably certain to endure in the future (if applicable) for the loss of a chance) | $_____ |
| Reasonable and necessary medical expenses for the loss of a chance | $_____ |
| Lost wages for the loss of a chance | $_____ |
| Permanent impairment of her power to earn money for the loss of a chance | $_____ |
| Total | $_____ |

The damages to be considered are essentially the same for either theory of injury. The above instructions demonstrate that the effect of negligently failing to diagnose a patient's condition can result in more than one type of injury. While not physical, the loss of the chance for a better recovery is real, and it resonates with anyone who has ever been denied an opportunity for something important. Certainly, there can be no opportunity more important than that which might save one's life or prevent debilitation from the failure to diagnose a condition. Every patient in this scenario doubtless feels that a tangible thing has been lost when they are denied their chance for a better result. And, there is no unfairness in this to the physician. Lost chance is never reached by the trier of fact unless it also finds that a physician acted negligently toward his or her patient.

I further differ from the majority opinion in that I do not believe that this theory of injury will open the floodgates to unnecessary litigation, nor do I agree that this Court should look past the realities of what is lost by a negligent failure to diagnose to whether a potential financial burden "might be spread upon the shoulders of millions of people...." Being "troubled" about the cost of insurance or any other industry, or referencing universal health care when this country does not have it, moves into territory to which I do not believe an impartial Court should go. Even assuming this is an appropriate concern for the Court, it is not clear that the majority's rule, with its all-or-nothing approach, does not result in larger damage awards, since a plaintiff need only show a better than 50% chance in order to recover the full measure of damages against the physician. Arguably, adoption of the lost chance rule would result in more verdicts, but those would be balanced by lower damage awards.

Therefore, I would affirm the Court of Appeals, but for the reasons as stated above.

THOMAS C. SMITH, Special Justice, joins this dissenting opinion.