Filed 09/23/25

## STATE OF VERMONT

| | |
|---|---|
| **SUPERIOR COURT** | **CIVIL DIVISION** |
| **WINDHAM UNIT** | Docket No. 21-CV-1251 |

**JOHN DOE,**
**Plaintiff**

**v.**

**NEW ENGLAND KURN HATTIN HOMES,**
**Defendant**

### Decision: Defendant's Motion for Summary Judgment, Motion #64

Plaintiff John Doe, now an adult, was a student at Defendant Kurn Hattin's residential school for underprivileged children from his first through sixth grade years. He asserts that he was subject to physical and sexual abuse while there and alleges that there was a culture of acceptance of abusive behavior on the part of staff that resulted in abuse by both staff and students. He raises five legal claims: gross negligence, breach of fiduciary duty, intentional infliction of emotional distress, gross negligent infliction of emotional distress, and battery. Kurn Hattin seeks summary judgment on all counts as a matter of law.

Plaintiff responded to Kurn Hattin's Statement of Undisputed Material Facts pursuant to V.R.C.P. 56 (c). Plaintiff also filed a separate Statement of Undisputed Material Facts pursuant to V.R.C.P. 56 (c)(2) to which Kurn Hattin responded. Below is a summary of undisputed admissible material facts derived from review of these documents. Proposed facts of both parties are not included if the court determined from responses that the proffered facts were either disputed, based on inadmissible evidence, not material to any claim, or expressions of personal or legal opinion rather than fact.[1]

### Undisputed Facts presented by Kurn Hattin

Plaintiff attended Kurn Hattin from 1968 to 1974, from first through sixth grade. Kurn Hattin is a year-round residential school serving underprivileged children that has been operating in Vermont since 1894. Plaintiff's brother and sister also attended the school, and his mother, aunts, uncles, and grandmother visited him while he was there.

Plaintiff never reported any abuse at Kurn Hattin to his mother, grandmother, aunts, or uncles while he attended the school, except that he told his mother one time in a letter that a teacher was mean. Plaintiff's mother did not speak to Kurn Hattin about his complaint.

---

[1] Pursuant to the Protective Order issued by the court on March 8, 2022 and the related Confidentiality Agreement which it cross references, the names of staff and students are not yet public. Therefore, in this decision, initials are used in place of full names of staff and students, following the model in V.R.A.P. 34 (l).

1

Plaintiff did not tell any administrator or employee at Kurn Hattin about any alleged abuse by Kurn Hattin employees G.D., C.M., H.R., B.K., P.W., M.M. [M.], H.S., M.S., M.C., "Ms. R.," C.K., P.R. or S.R., L.C. or student C.L. Plaintiff did not recall whether he told any administrator or employee at Kurn Hattin about any alleged abuse by students W.S. or M.M.

Plaintiff told G.D. that student R.Q. hit him but does not recall whether he told any other administrator or employee about any alleged abuse by R.Q. He did not recall whether he told any administrator or employee about any alleged abuse by student R.C. He also did not recall whether he told any administrator or employee about any alleged abuse by houseparents J.S. and C.S. He informed J.F., Assistant Director, of abuse he suffered at the hands of a fellow student, L.B., and Mr. F. responded by physically disciplining L.B.

Plaintiff's Kurn Hattin student file does not include any records supporting or indicating that Plaintiff experienced any abuse at the school, nor any records supporting or indicating that Plaintiff reported any abuse while he attended Kurn Hattin.

Kurn Hattin's September 1970 Annual Report notes that Kurn Hattin's psychologist "continue[d] to provide testing services and evaluations of the children," consulted "with the adults to guide their efforts in dealing with children's problems," and conducted individual and special group therapy with "very satisfactory results." Kurn Hattin's November 1973 Bulletin reflects that the

> [h]ealth of our children and staff has been excellent during the year [1973]. No more that the usual number or minor coughs and colds have been experienced. Our physical and nurse have given close attention to preventive immunizations. Our ordinary dental work has been kept up to date. A few children have been referred and are undergoing orthodontic treatment. We have been assisted to guide our children and give attention to their mental health by some very competent professionals engaged through a local agency. School progress has been very even and in some respects outstanding. Extra help has been available and provided to those children who seemed to need it most.

Plaintiff first communicated his allegations of abuse to Kurn Hattin only after he left Kurn Hattin except for the report to Mr. F. about L.B.

Before Plaintiff attended Kurn Hattin, his father left his mother to live with a 14-year-old. His parents divorced when he was around the age of 6, and his mother was a young, 23-year-old single mother of three children. Before he attended Kurn Hattin, she supported the family through assistance from New Hampshire's Department of Welfare and was not working while she attended school. His father only visited him once in the six years that he attended Kurn Hattin, but he visited his father after Kurn Harrin. When Plaintiff was asked during his deposition if not having a father around impacted his life, he testified that he was "quite sure it has. It's well documented, the effects of fatherless children."

Plaintiff has held over forty different jobs as an adult. Since 1999, he has worked in many fields, including financial securities, auto sales, architectural stone design, construction, web

2

design, computer hardware, composite technology, cabinet making, and now presently as an independent carpenter. He repeatedly quit jobs due to perceived "unethical or legal issues involved or irresponsible matters." His wife's physical abuse included hitting him, slapping him, hitting him with objects including plates, pots, and a metal pipe. At some point after separation, his wife held him at knife point for two hours. He testified that she was psychologically abusive telling him that he was "disgusting" and "worthless."

Plaintiff was convicted of criminal threatening and domestic violence assault and sentenced to three years of jail time and two years of probation; he was only required to serve six months in jail. He claims that other inmates attempted to physically abuse and rape him while he was incarcerated. After his release in June 2017, he experienced homelessness for two to three months. He lived in a motel for a short period, then a shelter. He had many concerns with how the shelter was run. He described the shelter staff as "emotionally abusive" and found them to be "irresponsible and negligent [in their] behavior and actions."

Plaintiff claims physical injuries of "back pain and instability" and knee pain. He claims to have "suffered from depression since the age of 6" and "Complex PTSD" and "a loss of enjoyment of a life that has been filled with stress, anxiety, and low self-esteem."

**Additional Undisputed Facts presented by Plaintiff[2]**

Other students at Kurn Hattin forced Plaintiff to engage in oral sex and attempted anal sex, including pushing their genitals into Plaintiff's face while making demeaning comments. In one instance another student named R.C. who was several years older than Plaintiff "forced himself on [Plaintiff], forcing his erect penis in [Plaintiff's] face and into [Plaintiff's] mouth." After this interaction, R.C. threatened to kill Plaintiff if he told anyone. In another instance, another student named R.Q. forced Plaintiff to his knees and forced his penis into Plaintiff's mouth and face. Plaintiff was in many instances able to fight the other students off, who, in one instance, repeatedly punched Plaintiff in the chest and shoulder for refusing to submit to them.

Plaintiff was dropped off a porch roof by two students.

The SSs [J.S. and C.S., houseparents] sexually, physically, and emotionally abused Plaintiff. The SSs would force Plaintiff to endure daily physical exertion to the point of exhaustion, prevent Plaintiff from using the bathroom, and force him to stand naked in his own urine. While Plaintiff was forced to engage in physical exertion, Mr. S. "sat there with his hands folded and watched [the boys] while bare naked, sweaty little trembling boys went up and down."

The SSs would publicly humiliate Plaintiff and other boys for poor grades; require Plaintiff to stand in the corner for hours; force Plaintiff and other boys to undergo nude

---

[2] As to many proposed facts in Plaintiff's Statement, Kurn Hattin did not state that it was undisputed or disputed but instead relied on legal argument. In such cases, the court has treated the proposed fact as undisputed for purposes of this motion pursuant to V.R.C.P. 56 (e), which provides: "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) . . .(2) consider the fact undisputed for purposes of the motion."

3

inspections, including of their genitalia, in front of the SSs and other children. This was called a "daily skidmark check at 4:30 every day." This meant that "[the boys] had to drop [their] pants in front of the entire rest of the population and be inspected, our arses, our underpants, while nude in front of Mrs. S, Mr. S, and all the other boys at Kurn Hattin."

Mrs. S would watch him and the other boys shower. The SSs would have Plaintiff and other boys line up naked in the shower room to be visually inspected while each boy was required to twirl nude before being permitted to shower. During showers, the SSs would ogle each of the boys while being "admonished to wash" their genitals thoroughly. When the boys did not do as Mr. S. asked, he would smack the boys' bare buttocks. The SSs subjected Plaintiff to this abuse "every day" from the time that Plaintiff first attended Kurn Hattin.

Principal H.R. smashed Plaintiff's "head and face into the cement floor" in front of the entire student body.

After the SSs had been terminated, B.K. and Mrs. K. became Plaintiff's houseparents in his third year at Kurn Hattin. Ms. K. sexually abused Plaintiff by watching Plaintiff shower without any safety, educational, or other legitimate purpose or need to watch Plaintiff shower. Ms. K. regularly "ogled" and leered at Plaintiff while he showered using the same excuse that the SSs had, that she was doing so to prevent horseplay. This practice of watching young naked boys shower ceased when J.K. and J.K. became Plaintiff's houseparents.

In one instance, after Ms. K. had become angry with Plaintiff, she "immediately dragged [Plaintiff and another student] downstairs past the locker room into the bathroom, and [stood] there and [told] us to take our pants off. We take our pants off, and then she hands us some dry rags. And then she tells us to scrub the floor with our pants off, which we did back and forth, back and forth, back and forth on our bare hands and knees until that floor shown polished with a dry rag."

M.C., the first and second grade teacher, whipped and smacked Plaintiff during his first and second grade years. Ms. R. [first name unknown], Ms. C.'s teaching assistant, also engaged in this. In one instance, Plaintiff recalled that "[s]he hauled me into the supply closet, yanked down my pants and proceed[ed] to whip me quite thoroughly and painfully with her own favorite yardstick." The fifth-grade teacher, M.S., engaged in frequent physical assaults of Plaintiff, including using a yardstick to smack Plaintiff with it on the head or shoulders.

G.D. became Plaintiff's houseparent after Mses. [sic] K. and K. Ms. D. made Plaintiff watch while the other boys stripped to their underwear during a "game" during which the boys were required to gather in a Twister game-like ball on the floor during which Ms. D. would take Polaroid pictures of them. Plaintiff recalled that in one instance, this "game" had "ended up with all of the B. boys smashed together into a "writhing mass of young boys, sans garments, but for their underpants." While the boys stood together, Ms. D. ran out of the room and then returned with a Polaroid instant camera. Plaintiff knew when he was a young boy that this game was "bizarre," uncomfortable, and humiliating.

4

During the summer of 1971, Plaintiff stayed at Kurn Hattin. During that summer, C.M., the farm manager, smacked Plaintiff in the back of the head on numerous occasions if Plaintiff's work displeased Mr. M. or if Plaintiff was unable to pick up heavy hay bales.

P.W., the then-Director's wife, physically grabbed and screamed at Plaintiff. L.C., the seventh-grade teacher physically grabbed and screamed at Plaintiff. Mr. C. was also a coach and would supervise the boys when they would go to the girls' department to use the swimming pool. In the changing room at the pool, Mr. C. would change in front of the boys, including Plaintiff, and would put his penis "directly in" Plaintiff's face after Mr. C. had changed into swim trunks, which the boys were not permitted to wear while swimming.

C.G., who stood in as Assistant Director when Mr. F. was absent in one instance, caught Plaintiff cutting the grass [cut across a section of grass rather than use a set path], which Plaintiff did not know was prohibited. Mr. G. proceeded to take Plaintiff to Mr. F.'s office, "yanked" Plaintiff's pants down, bent him over Mr. F.'s desk, and proceeded to "violently whip" Plaintiff's buttocks with a leather belt until it was raw. Mr. G. was "filling in for assistant director J. F."

J.F. was the Assistant Director at Kurn Hattin during the time Plaintiff was a student. Mr. W. was the Director from 1963 until 1976. Mr. F. knew that L.B. had beaten Plaintiff after Plaintiff reported this beating to Mr. F. When Plaintiff reported that L.B. had beaten Plaintiff to Mr. F., Mr. F. responded by whipping L.B. with his belt.

Plaintiff suffers from "constant anxiety," including "physically manifesting flashbacks" which he claims is a result of his experience at Kurn Hattin. Plaintiff claims that his experience at Kurn Hattin has led to a "loss of enjoyment of a life that has been filled with stress, anxiety, and low self-esteem."

As to Ms. K., Plaintiff told his mother about how she was mean. Ms. K. read that letter and thereafter became "incredibly defensive and hostile."

Everyone was aware of the abuse occurring at Kurn Hattin. "[I]t was so common there, things were observed all the time . . .'abuse was an everyday, normal occurrence' . . . 'there were no secrets there as far as the staff went.'"

## Analysis

Defendant Kurn Hattin argues that it is entitled to summary judgment on each of the five counts in the Amended Complaint: gross negligence, breach of fiduciary duty, intentional infliction of emotional distress, gross negligent infliction of emotional distress, and battery. Plaintiff opposes summary judgment on all counts.

A party is entitled to summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a). "The moving party has the burden of proof, and the opposing party must be given the benefit of all reasonable doubts and inferences in determining whether a genuine issue of material fact exists." *Price v. Leland,* 149 Vt 518, 521 (1988), *Tillson v. Lane,* 2015 VT 121, ¶ 7, (citing *Smith v. Parrott,* 2003 VT 64, ¶ 6,). The court resolves all reasonable doubts and

5

inferences in favor of the non-moving party. *Tillson*, 2015 VT 121, ¶ 7 (citing *Smith*, 2003 VT 64, ¶ 6).

## Gross Negligence

Plaintiff relies on 12 V.S.A. § 522, the statute of limitations for actions based on childhood sexual and physical abuse, in bringing his claims against Kurn Hattin at this time, as the statute provides that a claim "may be commenced at any time after the act alleged to have caused the injury or condition." 12 V.S.A. § 522 (a).[3] The statute is specific that it authorizes damages against a third-party that is "an entity that employed, supervised, or had responsibility for the person allegedly committing the sexual abuse only if there is a finding of gross negligence on the part of the entity." 12 V.S.A. § 522(d).

> "Childhood sexual abuse" means any act committed by the defendant against a complainant who was under 18 years of age at the time of the act and which act would have constituted a violation of a statute prohibiting lewd and lascivious conduct, lewd or lascivious conduct with a child, felony sexual exploitation of a minor in violation of 13 V.S.A. § 3258 (c), sexual assault, or aggravated sexual assault in effect at the time the act was committed. 12 V.S.A. § 522(c)(1).

Similarly, the statute for actions based on childhood physical abuse authorizes damages against a third party that is "an entity that employed, supervised, or had responsibility for the person allegedly committing the physical abuse only if there is a finding of gross negligence on the part of the entity." 12 V.S.A. § 522(e).

"'Childhood physical abuse' means any act other than an attempt committed by the defendant against a complainant who was under 18 years of age at the time of the act and which act would have constituted a violation of a statute prohibiting aggravated assault in effect at the time the act was committed." 12 V.S.A. § 522(c)(1).

With respect to the physical abuse claim, Defendant claims that Vermont did not have an "aggravated assault" statute until 1971, apparently arguing that Plaintiff cannot rely on 12 V.S.A. § 522 as a basis for any alleged childhood physical abuse prior to that time. Plaintiff was at Kurn Hattin from 1971-1974, so some incidents could have occurred during that time.

The elements of a cause of action of gross negligence are the elements of a negligence action—duty, breach, causation, and injury[4]—plus an additional heightened requirement that in order for conduct to amount to *gross* negligence, it must be "more than an error of judgment, momentary inattention, or loss of presence of mind." *Rivard v. Roy*, 124 Vt. 32, 35 (1963). Gross negligence "amounts to a failure to exercise even a slight degree of care and an indifference to the duty owed [to another]." *Hardingham v. United Counseling Service of Bennington Cty., Inc.*, 164 Vt. 478, 481 (1995).

---

[3] The statute retroactively eliminated the prior limitations period for both childhood sexual abuse and childhood physical abuse claims. *A.B. v. S.U. et al,* 2023 VT 32.

[4] *Zeno-Ethridge v. Comcast Corporation et al.,* 2024 VT 16, ¶32. The injury must be to the physical body and not solely a mental or emotional harm. *Id.* at ¶¶ 33-36.

6

<u>Duty of Care</u>

Defendant argues that Plaintiff has failed to provide evidence of the existence of a duty of care, which is fundamental to a negligence claim. See *Lewis v. Bellows Falls Congregation of Jehovah's Witnesses*, 95 F. Supp. 3d 762, 766 (D. Vt. 2015) ("To hold a defendant liable for negligence, a plaintiff must establish the defendant owed her a particular duty of care, it breached that duty of care, and the breach harmed the plaintiff"). Kurn Hattin argues that the Plaintiff cannot prove the element of duty because Plaintiff did not report incidents of abuse and thus Kurn Hattin had no reason to know that abusive conduct was occurring; therefore, no duty arose to take action to prevent it.

While there is generally "no duty to control the conduct of another to protect a third person from harm," duty may exist if there is a "special relationship between two persons which gives one control over the actions of another." *Id.* at 768. The Restatement (Second) of Torts recognizes in Sections 317 and 319 that a special relationship can create a duty on the part of a defendant to control the actions of others to protect from harm.

Another type of special relationship arises when one "take[s] charge of helpless persons, even when they are not required to do so," creating a duty to protect under Section 324 of the Restatement (Second) of Torts. *Sabia v. State*, 164 Vt. 293, 304 (1995) (superceded on other grounds, see *Stocker v. State*, 2021 VT 71, ¶ 19, 215 Vt. 432); *Lewis*, 95 F. Supp. 3d at 768–769. Section 324 imposes liability on an actor who takes charge of a person in need of aid, such as a minor, for "failure . . . to exercise reasonable care to secure the safety of the other while within the actor's charge." Restatement (Second) of Torts § 324. *Id.* at cmt. b ("[i]t applies also to one who takes charge of another who by reason of his youth is incapable of caring for himself"). The undisputed facts show that Kurn Hattin undertook to provide a full-time living environment for young children with underprivileged backgrounds.

Kurn Hattin is also subject to a duty by virtue of its role as a principal "conducting an activity through servants or other agents" as defined by Section 213 of the Restatement (Second) of Agency. *Lewis*, 95 F. Supp. 3d at 767 ("[i]n Vermont, a claim of negligent supervision is based on the Restatement (Second) of Agency § 213"). The duties related to supervision under Section 213 include exercising due care in relation to employing and retaining employees, giving directions to agents, and preventing negligent conduct on property in the principal's control. Restatement (Second) of Agency § 213. See e.g., *Id.* at cmt. c ("the directions may be negligent because the principal does not anticipate circumstances which he should realize are likely to arise"); *id.* at cmt. d ("[t]he principal may be negligent because he has reason to know that the servant or other agent, because of his qualities, is likely to harm others in view of the work or instrumentalities entrusted to him").

Kurn Hattin undertook to assume full-time care of young underprivileged children—in essence to act *in loco parentis* to a group of young children who had already experienced deficiencies in their upbringing. It is logical to assume that such children needed oversight to provide them with a safe secure environment, that some of the children may have experienced abuse themselves and might pose a safety risk to other children, and that some adults attracted to

7

the role of houseparents or teachers might have a prurient interest in children themselves or have difficulty distinguishing between acceptable discipline and physical abuse.

As a result, Kurn Hattin had the obligation to staff the institution with teachers and house parents who would provide the children with a safe nurturing environment free from physical abuse, and to institute procedures to ensure the physical safety of the children. It was responsible for monitoring the actions of its own staff and the children under its care. It cannot claim that its duty arose only when it received reports of misbehavior on the part of students or staff. It was its duty to foresee specific risks that were reasonably likely to occur in the environment it created and take active steps to prevent predictable harm.

It differs from the duty of a high school where the children attend for limited hours on weekdays and the harm that occurred was beyond what might reasonably be anticipated, as in *Edson v. Barre Supervisory Union No. 61*, 182 Vt. 157 (2007) and *Stopford v. Milton Town School District*, 209 Vt 171, ¶16 (2018). In *Edson,* the Court left open the possibility of circumstances under which a school could be liable for negligent supervision. *Id.*

In this case, the school was 100% responsible for the welfare, safety, and protection of very young children 24 hours each day on a long-term basis, sometimes all year round, in a community made up of children with problematic upbringings. This is not to suggest that it was strictly liable for every possible incident. However its duty is defined by the nature of the responsibility it undertook, which was to provide a safe, non-abusive environment for vulnerable young children full time. Kurn Hattin could reasonably have foreseen that without vigilant oversight, patterns of abusive and/or sexualized behavior on the part of both students and staff could be anticipated and preventive or monitoring measures needed. The court reaches no conclusion that this is what happened, but the undisputed facts are sufficient for the jury to conclude that a special relationship existed that gave Kurn Hattin the duty to protect Plaintiff and other children from abusive behavior on the part of both teachers and other children, irrespective of whether or not incidents were reported to the administration. Jurors can evaluate the reasons that reports are not made in such an environment.

Breach, including heightened requirement for a claim of *gross* negligence

To determine breach of duty in a regular negligence case, the jury must normally determine whether the defendant failed to avoid or prevent injury or harm to the claimant. Determination of breach of the duty of care usually depends on an evaluation of what a reasonably prudent person might reasonably have foreseen or expected to happen, given the circumstances. The standard is heightened for a claim of gross negligence.

Gross negligence "amounts to a failure to exercise even a slight degree of care and an indifference to the duty owed [to another]." *Hardingham v. United Counseling Service of Bennington Cty., Inc.,* 164 Vt. 478, 481 (1995). Thus to find a breach the jury must determine that Kurn Hattin failed to exercise even a slight degree of care and was indifferent to its duty to the students. "The existence of such negligence in a case turns almost entirely on its own peculiar factual situation" and is generally a question of fact for the jury. *Rivard* 124 Vt. at 35,

8

36. Consequently, "an allegation of gross negligence may be dismissed by the court only if reasonable minds cannot differ." *Kennery v. State*, 2011 VT 121, ¶ 41, 191 Vt. 44, 64.

In this case, the court concludes that reasonable minds could differ over whether Plaintiff's evidence meets this standard. Depending on how the jury evaluates the evidence, it could conclude that Kurn Hattin had a duty to Plaintiff, and that it was indifferent to its duty to Plaintiff and failed to exercise even a slight degree of care.

Causation and Harm

Plaintiff claims that he has PTSD (post traumatic stress disorder) as a result of his experiences at Kurn Hattin. Defendant notes that the only expert who evaluated Plaintiff concluded that his experience at Kurn Hattin was an Adverse Childhood Experience, but that Plaintiff suffered many Adverse Childhood Experiences and the expert could not isolate the extent of causation of his Kurn Hattin experiences versus other events in relation to a clinical diagnosis. Defendant thus argues that Plaintiff cannot prove either causation or harm.

The court agrees that expert opinion testimony would be necessary to support evidence that Plaintiff's experience at Kurn Hattin was a direct cause of PTSD. Plaintiff himself is not qualified to testify that abuse at Kurn Hattin caused any specific clinical mental or emotional diagnosis; expert testimony would be needed. *Human Rights Commission v. Labrie, Inc.*, 164 Vt. 237, 247 (1995). Nonetheless, Plaintiff may testify as to the extent to which abusive events at Kurn Hattin arising from claimed gross negligence caused physical hurt to his body. *Id.*

He may also testify as to humiliation and emotional distress he experienced without the need for expert medical testimony. The Vermont Supreme Court has upheld an award for emotional distress damages in a housing discrimination case where a complainant testified about the humiliation and emotional distress experienced, without the need for expert medical testimony, as such emotional distress was not beyond the understanding of a layperson and could be inferred from the circumstances. *Human Rights Commission v. Labrie, Inc.* at 248. The Court held that "[m]edical evidence on mental or physical symptoms is not required." *Id.*

In summary with respect to Plaintiff's claim of abuse based on gross negligence, Defendant's motion for summary judgment is denied. There is sufficient evidence on each element to go to trial, with the evidence to be evaluated by the jury.

**Other causes of action**

Plaintiff has also asserted four other causes of action: breach of fiduciary duty, intentional infliction of emotional distress, gross negligent infliction of emotional distress, and battery. Defendant argues that the statutory requirement of a finding of gross negligence makes 12 V.S.A. § 522 only applicable to claims sounding in negligence, and that therefore the claims for breach of fiduciary duty, IIED, and battery are barred because they are not negligence-based claims. It also argues that Plaintiff's claim of negligent infliction of emotional distress is inapplicable because it does not require a finding of *gross* negligence.

9

12 V.S.A. § 522 does not specify that any particular civil causes of action are either required or disallowed for claims pursued in reliance on the statute of limitations specified in that statute, as long as the claim is for injury suffered as a result of childhood sexual or physical abuse and "would have" satisfied the elements of specified crimes. The gross negligence requirement is only applicable if the defendant is an entity that "employed, supervised, or had responsibility for the person allegedly committing the [physical or sexual] abuse" and thus the requirement of a gross negligent finding is inapplicable to a suit against an individual defendant alleged to have committed childhood abuse.

Therefore, a plaintiff may seek to rely on the statute of limitations in 12 V.S.A. § 522 regardless of the particular civil cause of action it chooses to pursue as long as other requirements are met. The statute specifies that if the defendant is an entity that employs or supervises others, there must be a finding of gross negligence. This is a requirement that is in addition to the other elements of the cause of action chosen if it is not already an element of the claim. For the reasons stated above, Plaintiff is not precluded from seeking to prove gross negligence at trial and thus is not precluded from asserting the four other claims as well.

Consequently the court addresses Defendant's motion for summary judgment on those four claims based on the undisputed facts and the elements of those claims.

**Breach of fiduciary duty**

Defendant argues that the existence of a fiduciary duty is a question of law for the court, relying on *McGee v. Vermont Federal Bank,* 726 A.2d 42, 44 (Vt. 1999), and that no fiduciary relationship exists between a school and its students. Defendant notes that the Vermont Supreme Court has never recognized a fiduciary relationship between a student and a school or a school official, relying on *Knelman v. Middlebury Coll.,* 898 F. Supp. 2d 697, 717 (D. Vt. 2012) in which the Vermont District Court wrote that courts in the Second Circuit have held that "a fiduciary relationship generally does not exist in the school context." *Id.*

Black's Law Dictionary describes fiduciary duty as follows:

> A duty of utmost good faith, trust, confidence, and candor owed by a fiduciary (such as an agent or a trustee) to the beneficiary (such as the agent's principal or the beneficiaries of the trust); a duty of utmost good faith, trust, confidence, and candor owed by a fiduciary (such as a lawyer or corporate officer) to the beneficiary (such as a lawyer's client or a shareholder); a duty to act with the highest degree of honesty and loyalty toward another person and in the best interests of the other person (such as the duty that one partner owes to another). For example, directors have a duty not to engage in self-dealing to further their own personal interests rather than the interests of the corporation.

DUTY, Black's Law Dictionary (12th ed. 2024)

The Vermont Supreme Court has stated that a fiduciary relationship may arise where one person "is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Handverger v. City of Winooski,* 191 Vt. 84, 89 (2011) (citing *Cooper*

*v. Cooper*, 173 Vt. 1, 7 (2001)). To become fiduciary in nature, a relationship must "ripen into one in which [one party] were dependent on, and reposed trust and confidence in,[another party] in the conduct of their affairs." *Cap. Impact Corp. v. Munro*, 162 Vt. 6, 10 (1992). These descriptions, which are appropriate for guardianship and trusteeship relationships, do not match the relationship between Kurn Hattin and Plaintiff attending the school as a young child.

Plaintiff relies on *Doe v. Hotchkiss Sch.*, in which the United States District Court for the District of Connecticut found that a school had a fiduciary duty to its private high school boarding student because of its superior knowledge and control of the student's environment. No. 3:15-CV-160 (VAB), 2019 WL 1099027, at *16 (D. Conn. Mar. 8, 2019). The court relied exclusively on Connecticut state law precedent.

The court concludes that this is not precedent in Vermont, and the reasoning of the Vermont District Court in *Knelman* is more persuasive than that of the Connecticut District Court. Moreover, attributing a fiduciary duty to the relationship between Plaintiff when he was ages 6-12 and Kurn Hattin, a residential school for underprivileged children, is not consistent the general concept of a fiduciary relationship and duty as described in Black's Law Dictionary. The fact that a duty based on a "special relationship" may have been present docs not equate to a legal determination that there was a fiduciary relationship

Defendant's motion for summary judgment is granted as to this cause of action.

**Intentional Infliction of Emotional Distress**

The elements of this cause of action are " 'outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct.' " *Baldwin v. Upper Valley Servs., Inc.*, 162 Vt. 51, 55 (1994)(citing *Crump v. P & C Food Markets, Inc.*, 154 Vt. 284, 296 (1990)).

Prohibiting elementary school age children from using the bathroom, requiring them to stand in their own urine, requiring them to scrub a floor on their hands and knees while naked, and smashing a child's head and face into a cement floor are non-exclusive examples of incidents that satisfy the required elements such that Defendant is not entitled to blanket summary judgment on this cause of action. Because Defendant is an entity that acted through its teachers, houseparents, and officials, the jury will also be required to find gross negligence. The court has determined above that there is sufficient evidence to proceed to trial on gross negligence. Thus Defendant's motion for summary judgment is denied as to this claim.

**Gross Negligent Infliction of Emotional Distress**

Negligent Infliction of Emotional Distress is a cause of action that applies when a plaintiff makes a showing for recovery of emotional distress damages in situations where there has been concurrent physical harm of some sort in the vicinity of the plaintiff. *Zeno-Ethridge v. Comcast Corporation et al.*, 2024 VT 16, ¶6. The required elements of negligent infliction of emotional distress are different depending on whether plaintiff suffered a physical impact from an external force or not. If there was physical impact a plaintiff may recover for emotional

11

distress stemming from the incident during which the impact occurred. If there was no physical impact, the plaintiff must show that (1) he was within the "zone of danger" of an act negligently directed at him by defendant, (2) he was subjected to a reasonable fear of immediate personal injury, and (3) he in fact suffered substantial bodily injury or illness as a result. *Brueckner v. Norwich Univ.*, 169 Vt. 118, 123, (1999) (upholding jury verdict finding Norwich University vicariously liable for the assault and battery and negligent infliction of emotional distress caused by a cadre because the cadre was acting within the scope of employment).

Plaintiff cites several incidents described in the undisputed facts as grounds for this claim: being dropped off a porch roof; being forced by the SSs to engage in exhausting physical exertion or stand naked in his own urine or not be allowed to use the bathroom; Principal R. smashing his head and face into the cement floor in front of the entire student body; Ms. K. requiring him to remove his pants and scrub the floor on bare hands and knees; being whipped and smacked by his first and second grade teacher; having his pants yanked down and being whipped with a yardstick by a first or second grade teaching assistant; being smacked with a yardstick on his head and shoulders by a fifth grade teacher; being smacked on the back of the head several times by the farm manager; being physically grabbed and screamed at by the Director's wife; and being physically grabbed and screamed at by the seventh grade teacher.[5] Not all of these meet the requirement of facing physical impact from an external force, although many of them do.[6] There is sufficient evidence for the jury to evaluate whether the burden of proof for this claim is met.

Based on this determination and the determination set forth above that there is sufficient evidence to proceed to trial on the required finding of gross negligence, Defendant's motion for summary judgment is denied as to this claim.

**Battery**

Battery is an intentional act that results in harm to another. "[B]attery. . .is an intentional act that results in harmful contact with another." *Christman v. Davis*, 2005 VT 119, ¶6 (citing Restatement (Second) of Torts § 13 (1965)). Defendant argues that no evidence supports a finding that Kurn Hattin leadership directed anyone to cause harm to Plaintiff, and that Kurn Hattin cannot be vicariously liable for such a tort against Plaintiff because it was not within the scope of employment of any Kurn Hattin employee.

The court accepts the premise that Kurn Hattin leadership did not direct anyone to harm Plaintiff. Under Vermont law, "there is no requirement that the master specifically authorize the precise action the servant took. . . . Such a requirement would mean that there could rarely be vicarious liability for intentional torts because the master would not specifically authorize the commission of an intentional tort. The law is to the contrary. See Restatement (Second) of Agency §§ 230, 231 (1958); " *Sweet v. Roy*, 173 Vt. 418, 432 (2002).

---

[5] Defendant's Response to Plaintiff's Statement of Undisputed Material Facts, ¶¶ 3, 5-6, 17, 20-23, 27-29.
[6] The "zone of danger" alternative is inapplicable to the incidents described in the undisputed material facts.

As to whether conduct in the nature of abuse was within the scope of employment, Restatement (Second) of Agency § 229(1) is instructive. The Vermont Supreme Court relied on it in ruling that "[t]o establish that a servant's conduct falls within the scope of his or her employment, a plaintiff must demonstrate that the conduct: '(a) ... is of the kind the servant is employed to perform; (b) ... occurs substantially within the authorized time and space limits; (c) ... is actuated, at least in part, by a purpose to serve the master; and (d) in a case in which force is intentionally used by the servant against another ... is not unexpectable by the master.'" *Doe v. Forrest*, 2004 VT 37, ¶ 15, 176 Vt. 476.

The teachers, houseparents, and other staff at Kurn Hattin, acting *in loco parentis*, had responsibility for oversight of the children's behavior, including the use of discipline as well as enforcement of socially acceptable standards of personal modesty and sexualized behavior.

Defendant argues that corporal punishment was acceptable until 1983. That does not mean that all types of corporal punishment are exempt from being considered abusive. There is a difference between a measured spanking with an open hand on the buttocks of a clothed child and a vicious beating, or a form of corporal punishment that involves unnecessary exposure of nakedness to others. Managing discipline appropriately was certainly within the scope of employment of the staff at Kurn Hattin. The administration had reason to expect that some of its staff would have difficulty observing appropriate boundaries. Incidents alleged by Plaintiff to be battery on the part of staff can reasonably be considered within the scope of the employees' obligation to administer discipline and exercise behavioral oversight of the children, and thus within the scope of employment.

Plaintiff's claims of battery against Kurn Hattin based on vicarious liability for acts of its staff may be actionable when "the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation." Restatement (Second) of Agency § 219(2)(d). By delegating to staff the authority to impose discipline on the children, Kurn Hattin accepted the possibility of vicarious liability for battery that occurred through excessive use of force in the guise of discipline.

The undisputed fact that the school principal smashed Plaintiff's "head and face into the cement floor" is sufficient to overcome Defendant's motion for summary judgment on the claim of battery. As with all the other claims, because Defendant is an entity that acted through its teachers, houseparents, and officials, there must be a finding of gross negligence at trial in addition to findings related to the other elements of battery.

**Defendant's Argument Based on Lack of Expert Testimony on Damages**

Kurn Hattin argues that Plaintiff cannot prove which of his claimed damages were caused by Kurn Hattin as opposed to other potential causes. Kurn Hattin is correct that Plaintiff himself cannot purport to testify that his Kurn Hattin experience caused specific psychological injuries, and since he has no expert he cannot claim damages for specific psychological or medical diagnoses such as PTSD. *Sweet v. St. Pierre*, 209 Vt. 1 (2018) (upholding the trial court's ruling that an alleged assault could not reasonably be found to have caused the psychological and

13

physical injuries alleged by defendants in the absence of expert testimony). "Expert testimony is ordinarily required to prove medical causation." *Id.* at ¶26.

Nonetheless, he is not precluded from providing testimony that physical or sexual abuse he experienced caused him to have bodily injuries and temporary or permanent impact, such as mental anguish, pain and suffering, or loss of enjoyment of life. Vermont courts have long admitted plaintiffs' testimony about the emotional effects of their injuries and the activities that they now seek to avoid or in which they can no longer participate. *See, e.g., Thayer v. Glynn*, 93 Vt. 257, 106 A. 834, 835 (1919) ("Nor was there error in refusing to strike out the plaintiff's statement that since the accident he was nervous and did not like to drive in the nighttime. This was nothing more than his way of describing the nervous condition in which the accident left him, and was clearly admissible on the question of damages.") (citing *Rea v. Harrington*, 58 Vt. 181 (1886)). Dobbs describes that non-pecuniary damages are not compensatory in the sense of covering a money loss, nor punitive, but "to establish and vindicate a right that is deemed important, even though not pecuniary in its immediate consequence." Dobbs' Remedies § 3.1.

Expert testimony is not required if the impact of an experience of abuse can easily be understood by jurors on the basis of common knowledge. *Human Rights Commission v. Labrie, Inc.* (emotional distress damages in a housing discrimination case upheld where a complainant testified about the humiliation and emotional distress experienced, without the need for expert medical testimony. 164 Vt. 237 (1995)). While Plaintiff may not testify about matters of causation or harm that require expert testimony, he can testify to the extent that causation and harm can be understood by jurors as a matter of common experience. Thus, Defendant's argument for summary judgment based on lack of expert testimony is denied.

### Summary and Order

For the foregoing reasons, summary judgment is granted to Defendant on Plaintiff's claim based on fiduciary duty; otherwise, summary judgment is denied.

A pretrial status conference will be scheduled.

Electronically signed September 23, 2025 pursuant to V.R.E.F. 9 (d).

*Mary Miles Teachout*

Mary Miles Teachout
Superior Judge (Ret.), Specially Assigned

14